IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAI`I

```
_____
                                )
N.K. Collins, LLC,              )
                                )
          Plaintiff,            )
                                )
     v.                         )    Civ. No. 19-00386 ACK-RT
                                )
William Grant & Sons, Inc.,     )
William Grant & Sons, Ltd.,     )
and Does 1-10,                  )
                                )
          Defendants.           )
_____ )
```

**ORDER GRANTING DEFENDANTS' MOTIONS FOR PARTIAL SUMMARY JUDGMENT AND JUDGMENT ON THE PLEADINGS, AND DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Norman Keith Collins was a renowned tattoo artist, known as "Sailor Jerry," who lived and worked in Hawaii until his death in 1973.  First Amended Complaint, ECF No. 82 ("Compl."), ¶¶ 1, 10, 16.  This case is substantially about who now has the right to use his name, image, and artwork (the "Sailor Jerry IP").  Defendants are two companies that have been using the Sailor Jerry IP for years to market the product "Sailor Jerry rum" and other related merchandise.  Compl. ¶ 1.  Plaintiff is an organization consisting of Sailor Jerry's heirs, who argue that they have an exclusive legal interest in the Sailor Jerry IP under the 2009 Hawaii Publicity Rights Act and under the common law.  Compl. ¶ 1.  Plaintiff brought this

lawsuit against Defendants alleging that Defendants' use of the Sailor Jerry IP violates the heirs' exclusive interest.

Defendants now seek dismissal of each of the claims against them, arguing that (1) the Hawaii Publicity Rights Act cannot be retrospectively applied where Sailor Jerry died decades before its enactment; (2) Plaintiff's claim for unjust enrichment is insufficiently pled; and (3) Plaintiff unreasonably delayed bringing this lawsuit, and all of its claims should be barred under the doctrine of laches.  For the reasons set forth below, the Court:

      (1)   GRANTS Defendants' Motion for Partial Summary Judgment as to Counterclaim Count Two (Non-Retrospectivity of the Hawaii Publicity Rights Act), ECF No. 92 (the "HPRA Motion");

      (2)   GRANTS Defendants' Motion for Judgment on the Pleadings as to Count Four of the First Amended Complaint, unjust enrichment, ECF No. 91 (the "Enrichment Motion"); and

      (3)   DENIES Defendants' Motion for Summary Judgment on Laches as to all four counts of the First Amended Complaint, ECF No. 89 (the "Laches Motion"), on the basis that it GRANTS IN PART Plaintiff's Rule

56(d) request for additional time to conduct

discovery on its "unclean hands" defense.[1]


**FACTUAL BACKGROUND**

I.   **The 1973 Distribution and Sale of Sailor Jerry's Assets**

When Sailor Jerry died in 1973, his wife, Mrs.

Collins, initiated a probate of his estate.  Compl. ¶ 26.

Sailor Jerry's personal property consisted of a motorcycle and

"1 lot used tattoo machines, designs, stencils, miscellaneous

odds and ends," all of which Mrs. Collins purchased for $2,425.

Compl. ¶ 26; Laches Motion, Concise Statement of Facts ("CSF"),

ECF No. 90, Ex. 7.  Any "such property as remain[ed]" was to be

distributed in a one-third share to Mrs. Collins, and in a two-

thirds share equally among four of Sailor Jerry's children.

Compl. ¶ 27; Laches Motion CSF, Ex. 7.

Mrs. Collins subsequently sold the contents of Sailor

Jerry's tattoo shop for $20,000 to Michael Malone, an artist

that Sailor Jerry had mentored.  Compl. ¶ 30.  The agreement was

made orally and never written down.  Compl. ¶ 30.  Malone's

then-girlfriend, Kate Hellenbrand, provided a $5,000 down

payment on Malone's behalf and Malone paid the remainder over

---

[1] Aside from Defendants' Laches Motion, which the Court denies at this juncture, Defendants did not otherwise seek any relief with regard to Counts One, Two, or Three of the First Amended Complaint.  Rather, Defendants' HPRA Motion relates only to their Counterclaim Count Two.

the next several years.  Compl. ¶ 30.  In that sale, Malone

purchased "tattoo flash (and all copyright rights therein),

tattoo machines, and related items such as needles, some

furniture, and miscellaneous office equipment."  Compl. ¶¶ 25,

30.  The sale did not include "personal items" such as Sailor

Jerry's photographs or letters, which Mrs. Collins asked to be

returned to her.  Compl. ¶ 30.

      The critical point of contention now is whether Malone

purchased the right to the Sailor Jerry IP.  Malone died in

2007, but his 2003 affidavit asserts that he believed he had

purchased that right:

> I am the assignee of all right, title and interest
> in and to the name and certain artwork of the tattoo
> artist  Norman  Collins,  a/k/a  "Sailor  Jerry,"
> deceased.
> . . .
> In or about July of 1973, Mrs. Collins contacted me
> by  telephone  and  stated  that  Normal  Collins
> intended  to  offer  to  me  the  right  to  purchase  the
> Sailor  Jerry  name,  certain  artwork,  the  inventory
> and  equipment  from  his  store . . .  and  "everything
> else  related  to  his  tattoo  business."  . . .  Mrs.
> Collins  and  I . . .  did  orally  agree  on  a  total
> purchase  price  of  $20,000.  We  also  agreed  that
> upon  payment  of  this  amount,  I  would  become  the
> assignee/owner  of  all  rights  associated  with  the
> Sailor  Jerry  name  and  related  artwork.

Laches Motion CSF, Ex. 1 ("Malone Affidavit").  Mrs. Collins,

however, claims that the sale included only physical items in

the tattoo shop, and did not include any intangible intellectual

4

property rights or the right to use Sailor Jerry's name "for any purpose."[2/]  Compl. ¶ 30, 31.

## II.   Malone and His Successors Capitalize on the Sailor Jerry IP

After the sale, Malone proceeded on the understanding that he had purchased the rights to use the Sailor Jerry IP.  He agreed to share those rights with Ed Hardy, and by 1999 the two had created the entity Sailor Jerry Limited to make and market Sailor Jerry merchandise.  Compl. ¶¶ 36-38.  Two years later, Sailor Jerry Limited created the product "Sailor Jerry rum" and entered into a distribution agreement with Defendant William Grant & Sons, Inc.  Compl. ¶ 39.

Malone and Hardy then assigned their purported interests in the Sailor Jerry IP to the entity Sailor Jerry Limited.  Compl. ¶ 40.  Defendant William Grant & Sons, Ltd. later purchased Sailor Jerry Limited, including all rights assigned thereto.  Compl. ¶¶ 40-42.  Defendants William Grant & Sons Inc. and William Grant & Sons Ltd. (collectively, the "WGS Companies") have since continued to market and sell Sailor Jerry rum and other merchandise using the Sailor Jerry IP.  Compl. ¶¶ 44-45.

---

[2/]  Mrs. Collins did permit Malone to give proper authorship attribution for the flash and artwork that Sailor Jerry created and Malone used in tattooing.  Compl. ¶ 31.

### III.  Mrs. Collins Learns that Malone and His Successors Used the Sailor Jerry IP

Meanwhile, Mrs. Collins became aware in 1994 that Sailor Jerry's name was being used commercially.  At that time, Hardy (Malone's business partner) met with Mrs. Collins to show her a book that he intended to publish about Sailor Jerry, which included letters that Sailor Jerry had written to Hardy.  Laches Motion CSF, Ex. 6 ("Collins Dep."), at 37-39.  Mrs. Collins was bothered by the book but took no action at that time.  Id. at 39; Opp. to Laches Motion at 22 n.20.

Mrs. Collins first became aware of Sailor Jerry rum in 2008 or 2009.  She went to a restaurant with her daughter's family and saw a poster of Sailor Jerry's artwork on a bottle of rum.  Collins Dep. at 40-41; Ans. to Counterclaim, ECF No. 85, ¶ 20.  Mrs. Collins was surprised and went to a Longs Drugstore the next day to examine a bottle of Sailor Jerry rum.  Collins Dep. at 41-42.  Mrs. Collins believed the use constituted identity theft and contacted several attorneys, but she did not ultimately retain counsel.  Id. at 43-44; Opp. to Laches Motion at 7.

Shortly thereafter, Kate Hellenbrand—Malone's girlfriend at the time of the oral contract between Mrs. Collins and Malone—contacted Mrs. Collins.  Collins Dep. at 46-47.  Hellenbrand had published a book and told Mrs. Collins that the

photograph on the bottle of Sailor Jerry rum had been taken from her book.  Id. at 47; Opp. to Laches Motion at 6 n.6. Hellenbrand retained an attorney and organized a three-way call with her attorney and Mrs. Collins regarding the use of Sailor Jerry's artwork on the bottle of rum.  Collins Dep. at 48-49. Hellenbrand's attorney subsequently sent demand letters to Defendants in 2009, stating that Hellenbrand and Malone "became owners of the Sailor Jerry tattoo business and all related intellectual property in 1973," that Defendants were misappropriating that IP, and that "all this critical information" had been confirmed with Mrs. Collins.  Laches Motion CSF, Exs. 4, 5 (demand letters).[3/]

Mrs. Collins did not take any legal action against Defendants prior to filing this lawsuit in 2019.  Collins Dep. at 48-49.

## IV.   Formation of N.K. Collins, LLC

In 2018, Mrs. Collins formed the Plaintiff entity N.K. Collins, LLC ("Collins LLC") and is its sole manager.  Laches Motion, CSF, Ex. 17.  The four children who were to receive a portion of any remainder of Sailor Jerry's estate are each

---

[3/] The first demand letter was addressed to "Sailor Jerry Limited," and the second to legal counsel Paul Kilmer of Holland & Knight.  Laches CSF, Exs. 5, 6.  Since Defendants had already purchased Sailor Jerry Limited, they apparently received these letters.  See Laches Motion at 9 ("In August 2009, Defendants received two demand letters from [Hellenbrand's] attorney.").

members of Collins LLC, and they, along with Mrs. Collins, assigned all rights and interest in Sailor Jerry's intellectual property, including any right of publicity, to that entity. Compl. ¶ 5.  Collins LLC thus alleges that it is "the sole and exclusive owner of all statutory and common law rights and interests in and to Sailor Jerry's Persona."  Compl. ¶ 6.

## PROCEDURAL BACKGROUND

On June 13, 2019, Collins LLC brought this action against the WGS Companies for the WGS Companies' production and marketing of Sailor Jerry rum and related merchandise using the Sailor Jerry IP.  Compl. ¶ 1.  Collins LLC filed its initial complaint in Hawaii state court.  ECF No. 1-2.  The WGS Companies removed the case, ECF No. 1, and filed a series of dispositive motions seeking dismissal of the claims, ECF Nos. 19, 20, 28.  The WGS Companies simultaneously filed a motion to stay all discovery pending the resolution of their dispositive motions, ECF No. 25, which the magistrate judge granted, ECF Nos. 39, 57, and which remains in effect.

Meanwhile, prior to the Court's hearing on the dispositive motions, Collins LLC sought leave to file an amended complaint.  ECF No. 37.  Collins LLC was granted leave, ECF Nos. 65 & 81, and the Court therefore administratively withdrew the WGS Companies' pending dispositive motions, directing the WGS

Companies to file new motions covering the amended claims, ECF No. 84.

Collins LLC's First Amended Complaint asserts four causes of action: (1) a violation of its right of publicity under Hawaii Revised Statutes ("HRS") Chapter 482P (the "Hawaii Publicity Rights Act" or "HPRA"), Compl. ¶¶ 51-55; (2) cancellation of Defendant William Grant & Sons, Limited's publicity rights registration under the HPRA, Compl. ¶¶ 56-61; (3) a violation of Hawaii's common law right of publicity, Compl. ¶¶ 62-64; and (4) unjust enrichment, Compl. ¶¶ 65-69. Each cause of action is asserted against both Defendants except the second count, which is asserted only against Defendant William Grant & Sons, Limited.  The WGS Companies filed an Answer and a ten-count Counterclaim, including, as relevant at this juncture, Count Two for a declaratory judgment on the non-retrospective application of the Hawaii Publicity Rights Act. ECF No. 83.

On May 8, 2020, the WGS Companies filed new motions covering the amended claims.  The WGS Companies seek summary judgment on all four counts based on laches, ECF No. 89; judgment on the pleadings as to Count Four for unjust enrichment, ECF No. 91; and partial summary judgment on Count Two of their Counterclaim for the non-retrospectivity of Hawaii's Publicity Rights Act, ECF No. 92.  Collins LLC filed

its oppositions on June 1, ECF Nos. 101, 103, 105, and the WGS Companies filed their replies on June 8, ECF Nos. 111, 112, 114. A telephonic hearing was held on June 22.

**STANDARD**

**I.   Summary Judgment**

Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Federal Rule of Civil Procedure ("Rule") 56(a) mandates summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see also Broussard v. Univ. of Cal., 192 F.3d 1252, 1258 (9th Cir. 1999).

"A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact."  Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007) (citing Celotex, 477 U.S. at 323); see also Jespersen v. Harrah's Operating Co., 392 F.3d 1076, 1079 (9th Cir. 2004).  "When the moving party has carried its burden

10

under Rule 56[(a)] its opponent must do more than simply show that there is some metaphysical doubt as to the material facts [and] come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 586-87 (1986) (citation and internal quotation marks omitted); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (stating that a party cannot "rest upon the mere allegations or denials of his pleading" in opposing summary judgment).

"An issue is 'genuine' only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is 'material' only if it could affect the outcome of the suit under the governing law." In re Barboza, 545 F.3d 702, 707 (9th Cir. 2008) (citing Anderson, 477 U.S. at 248). When considering the evidence on a motion for summary judgment, the court must draw all reasonable inferences on behalf of the nonmoving party. Matsushita Elec. Indus. Co., 475 U.S. at 587; see also Posey v. Lake Pend Oreille Sch. Dist. No. 84, 546 F.3d 1121, 1126 (9th Cir. 2008) (stating that "the evidence of [the nonmovant] is to be believed, and all justifiable inferences are to be drawn in his favor" (internal citation and quotation omitted)).

## II.  Judgment on the Pleadings

Under Rule 12(c), "[a]fter the pleadings are closed—

11

but early enough not to delay trial—a party may move for judgment on the pleadings." Judgment on the pleadings is properly granted "when, accepting all factual allegations in the complaint as true, there is no issue of material fact in dispute, and the moving party is entitled to judgment as a matter of law." Chavez v. United States, 683 F.3d 1102, 1108 (9th Cir. 2012) (citation and original alteration omitted).

Analysis under Rule 12(c) is substantially identical to analysis under Rule 12(b)(6) because, under both rules, a court must determine whether the facts alleged in the complaint, taken as true, entitle the plaintiff to a legal remedy. Id.; see also Harris v. Cty. of Orange, 682 F.3d 1126, 1131 (9th Cir. 2012) (Rule 12(b)(6) and Rule 12(c) motions are functionally equivalent).

The Court must accept as true the facts as pled by the non-movant and will construe the pleadings in the light most favorable to the nonmoving party. U.S. ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc., 637 F.3d 1047, 1053 (9th Cir. 2011). Additionally, mere conclusory statements in a complaint or "formulaic recitation[s] of the elements of a cause of action" are not sufficient. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). "[D]ismissal with prejudice and without leave to amend is not appropriate unless it is clear on de novo review that the complaint could not be saved by amendment." Harris, 682

12

F.3d at 1131 (citation omitted).


## DISCUSSION

The WGS Companies seek a judgment dismissing all claims on the basis of laches; a judgment dismissing the unjust enrichment claim as both insufficiently pled and unavailable based on an adequate remedy at law; and a declaratory judgment on the non-retrospectivity of the HPRA.  The Court first concludes that the HPRA cannot be retrospectively applied to the WGS Companies.  The Court next considers the claim for unjust enrichment and finds that it fails to allege that any benefit was conferred on Defendants, and accordingly dismisses that claim.  Finally, the Court considers laches and finds that Collins LLC should be provided an opportunity to conduct discovery relating to its unclean hands defense.

## I.   Retrospective Application of the Hawaii Publicity Rights Act

The HPRA was passed in 2009 and created a statutory post-mortem descendible right of publicity in Hawaii.  Because Sailor Jerry died in 1973—thirty-six years prior to the statute's enactment—the parties dispute whether Sailor Jerry's heirs inherited any right of publicity under the statute.  The WGS Companies argue that the HPRA does not apply to those who predeceased its enactment.  According to the WGS Companies, a

presumption against retrospectivity applies because the language of the HPRA and the legislative intent in enacting it are ambiguous as to its effective dates, and it impairs the WGS Companies' substantial existing rights.  Collins LLC argues that the statute is clearly retrospective; and in fact, was a mere codification of existing common law rights.  The Court holds that the statute may not have retrospective operation as against the WGS Companies.

### a. The Court Declines to Certify the Issue

At the end of Collins LLC's opposition, it requests that the Court certify the issue of retrospectivity to the Hawaii Supreme Court "[i]f the Court is inclined to rule" against its position.  Opp. to HPRA Motion at 25 n.14.  At the hearing, both Collins LLC and the WGS Companies argued that certification is unnecessary and that the Court should decide the issue.

There is no Hawaii Supreme Court decision ruling on the retrospective application of the HPRA.  Where the Hawaii Supreme Court has not addressed an issue of state law, the district court may, in its discretion, certify the issue to the state supreme court.  Robert Ito Farm, Inc. v. Cty. of Maui, 111 F. Supp. 3d 1088, 1107–08 (D. Haw. 2015), aff'd sub nom. Atay v. Cty. of Maui, 842 F.3d 688 (9th Cir. 2016).  "When the law at issue is reasonably clear such that the court can readily

14

predict how the Hawaii Supreme Court would decide the issue, certification is inappropriate." Id. at 1108 (internal quotation marks and citation omitted).

Hawaii law on retrospective operation of statutes is reasonably clear. The Court finds the issue of a statute's retrospective operation determinable without certification—as have other courts in this district, see, e.g., Galima v. Ass'n of Apartment Owners of Palm Court, No. CV 16-00023 LEK-RT, 2019 WL 1982514, at *5 (D. Haw. May 3, 2019) ("Because there is no Hawai`i case law addressing whether § 667-102 applies retroactively, this Court must predict how the Hawai`i Supreme Court would decide the issue."), and as this Court has found in prior cases, Aileen Y. v. Dep't of Educ., No. CIV. 10-00454 ACK, 2011 WL 2223659, at *6 (D. Haw. June 6, 2011) (finding that "neither the statute nor its legislative history contains expressed or obviously intended retroactive effect" and "[t]he Court therefore will not apply the new version of section 302A-1134(c) retroactively"); Bator v. State of Hawai`i, Judiciary Adult Prob. Div., 910 F. Supp. 479, 486 (D. Haw. 1995) (denying retrospective application where "the amendment to Haw. Rev. Stat. § 386-5 clearly affects substantive rights, as it specifically provides for a new cause of action previously barred" and "the State legislature did not expressly direct that the amendment to § 386-5 be applied retroactively"). Therefore,

the Court elects not to certify the retrospectivity analysis here.

### b. Judicial Estoppel

Collins LLC next argues that "this Court need not even reach the merits" of retrospectivity "because Defendants should be judicially estopped from arguing that Collins's publicity rights do not exist" when, "[f]or years, Defendants have asserted that they own those rights."  Opp. to HPRA Motion at 21.  The WGS Companies respond that judicial estoppel does not apply to pure questions of law, and regardless its positions have not been inconsistent.  Reply supporting HPRA Motion at 16-17.

Although state law supplies the rule of decision in this diversity action, "federal law governs the application of judicial estoppel in federal court."  Rissetto v. Plumbers & Steamfitters Local 343, 94 F.3d 597, 603 (9th Cir. 1996).  "[J]udicial estoppel is an equitable doctrine invoked by a court at its discretion."  New Hampshire v. Maine, 532 U.S. 742, 750 (2001) (internal quotation marks omitted).  "[I]ts purpose is to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment."  Id. at 749-50 (citation and internal quotation marks omitted).  Judicial estoppel "bars a party from gaining an advantage by taking a position in a subsequent

16

lawsuit that is inconsistent with a position it took in a previous lawsuit." <u>Kawelo v. Nationstar Mortg. LLC</u>, Civ. No. 18-00096 JMS-KSC, 2018 WL 4354295, at *7 (D. Haw. Sept. 12, 2018) (brackets and citations omitted).

The United States Supreme Court has identified three factors courts should consider in determining whether to apply the doctrine of judicial estoppel: (1) whether a party's later position is "clearly inconsistent with its earlier position"; (2) whether the party persuaded the first court to accept the party's earlier position, so that judicial acceptance of the later inconsistent position "would create the perception that either the first or the second court was misled"; and (3) whether the party seeking to assert an inconsistent position "would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." <u>New Hampshire</u>, 532 U.S. at 750-51 (internal quotation marks and citations omitted). These factors are not "inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel." <u>Id.</u> Because judicial estoppel is a discretionary doctrine, its applicability requires a case-by-case determination. <u>Ah Quin v. Cty. of Kauai Dep't of Transp.</u>, 733 F.3d 267, 272 (9th Cir. 2013).

Collins LLC identifies two positions taken by the WGS Companies that it asserts are inconsistent with the WGS

Companies' present argument on the non-retrospectivity of the HPRA.  First, Defendant William Grant & Sons, Limited registered publicity rights of Sailor Jerry with the DCCA as is provided for in the HPRA.[4/]  Second, the WGS Companies obtained standing in the 2018 probate proceeding on the basis of their purported interest in Sailor Jerry's publicity rights.  In both cases, the WGS Companies asserted that they owned Sailor Jerry's publicity rights, which—Collins LLC argues—is inconsistent with their position in the present motion that the HPRA is not retrospective.

But the WGS Companies' positions are not inconsistent because their asserted property rights were never based on the HPRA.  Rather, the WGS Companies have always asserted that they obtained their property rights in the Sailor Jerry IP from Malone and other predecessors prior to the HPRA being enacted. See HPRA Motion, CSF, ECF No. 93, Ex. 6, at 6-7 (Petition to Vacate 2018 probate); see also Malone Affidavit.  The WGS Companies assert that they purchased the intellectual property in 2000; while the HPRA was not enacted until 2009.  Laches Motion, CSF, Ex. 2.  According to the WGS Companies, they "acquired such property, including Sailor Jerry's business, trade name, goodwill, and related intellectual property, from

---

[4/] Judicial estoppel is permitted where the prior statement was made in an administrative proceeding . . . rather than judicial." Rissetto, 94 F.3d at 604.

(1) their predecessors-in-interest; or (2) the public domain, upon Norman Collins's death."  Reply supporting HPRA Motion at 17.

Because the WGS Companies have not asserted property rights under the HPRA, their argument now that the HPRA is not retrospective is not inconsistent with their assertion of a property interest in the Sailor Jerry IP.[5/]  Judicial estoppel is therefore inapplicable, and the Court proceeds with the retrospectivity analysis.

### c. Hawaii Law on Retrospectivity

There is a codified presumption against retrospective operation of law in Hawaii, where "[n]o law has any retrospective operation, unless otherwise expressed or obviously intended."  HRS § 1-3.  The Hawaii Supreme Court has embraced the United States Supreme Court's definition of what constitutes retrospective operation:

> Every statute which takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty or attaches a new disability in respect to transactions or considerations already past, must be deemed retrospective.

---

[5/] In Collins LLC's Opposition, it acknowledges that in the 2018 probate preceding, "Defendants argued that they have a 'property right in'" Sailor Jerry's right of publicity, and additionally "argued (apparently in the alternative) before the probate court that the HPRA is not retrospective." Opp. to HPRA Motion at 23.

Taniguchi v. Ass'n of Apartment Owners of King Manor, Inc., 114 Haw. 37, 47, 155 P.3d 1138, 1148 (2007) (citations omitted); see also Landgraf v. USI Film Prod., 511 U.S. 244, 269, 114 S. Ct. 1483, 1499, 128 L. Ed. 2d 229 (1994).

Accordingly, Hawaii recognizes the "general rule in most jurisdictions that:  Statutes or regulations which say nothing about retroactive application are not applied retroactively if such a construction will impair existing rights, create new obligations or impose additional duties with respect to past transactions."[6/]  Clark v. Cassidy, 64 Haw. 74, 77 n.6, 636 P.2d 1344, 1346 n.6 (1981); see also Wong v. Takeuchi, 88 Haw. 46, 51, 961 P.2d 611, 616 (1998) (quoting same).  "Nevertheless, under an equally established rule of construction, a statute providing remedies or procedures that do not affect existing rights, but merely alter the means of enforcing or giving effect to such rights, may apply to pending claims—even those arising before the effective date of the

---

[6/] The Court here uses the term "retrospective," but certain courts, like Clark, refer to "retroactive" application of law.  "There is no difference in principle between a retrospective law and a retroactive law, either of which is one which takes away or impairs vested rights acquired under a different law or creates a new obligation, imposes a new duty or attaches a new disability in respect to transactions or considerations already past."  Roe v. Doe, 59 Haw. 259, 263–64, 581 P.2d 310, 314 (1978) (quoting Oleson v. Borthwick, 33 Haw. 766, 774 (1936)); see also 16A C.J.S. Constitutional Law § 645 (June 2020) ("As commonly used, the terms retrospective and retroactive are synonymous and interchangeable.").

statute." Gov't Emps. Ins. Co. v. Hyman, 90 Haw. 1, 5, 975 P.2d 211, 215 (1999) (citing Clark, 64 Haw. at 77).[7/]

The Court begins its analysis by considering the text of the statute.  If retrospectivity is not clearly stated or the text is ambiguous, the Court will turn to the legislative history.  If the retrospectivity is not clearly stated or the legislative history is ambiguous, the Court will then consider whether application of the statute to the WGS Companies would impair their existing substantial rights.

### d. The Text and Legislative History of the Hawaii Publicity Rights Act

#### 1. The Development of the Hawaii Publicity Rights Act

The enacted version of the HPRA was the Legislature's sixth revision of the bill.  Prior versions of the bill included differing language and the Legislature's development of the ultimately enacted statutory text is instructive.

First, the initial draft of the bill contained retrospectivity language (later removed) that expressly stated "[t]he rights recognized under this chapter shall be deemed to have existed before the effective date of this chapter," and the

---

[7/] The WGS Companies cite Hyman for the proposition that Hawaii has recognized the Supreme Court's test set out in Landgraf v. USI Film Prods., 511 U.S. 244 (1994).  HPRA Motion at 4-5.  Hawaii case law does largely mirror the test set out in Landgraf for interpreting federal law, but because interpretation of a Hawaii statute is at issue, the Court applies the standards as articulated in Hawaii case law. See Hyman, 90 Haw. at 5-6 (setting out the retrospectivity standards under Hawaii law, and quoting Landgraf in support of those standards).

statute was written to "take effect upon its approval."  Opp. to
HPRA Motion, CSF, ECF No. 102, Ex. 2, at 25, 28.  Section 1, the
"purpose" statement (set forth in the preamble), of that first
draft stated, "The purpose of this Act is to help protect in
Hawaii the music of Hawaii, and all other works of authorship,
by establishing a property right in the commercial use of a
person's name, voice, signature, photograph, or likeness."  Id.
at 23 (emphasis added).

     The second draft of the bill kept the retrospectivity
language but set the effective date of the bill to July 1, 2050.
Id. at 44, 47 (S.D. 1).  The third draft of the bill scrapped
the retrospectivity language entirely.  It added language that,
"Beginning August 1, 2009, every individual or personality has a
property right in the use of the individual's or personality's
name, voice, signature, photograph, or likeness."  Id. at 52
(S.D. 2) (emphasis added).  The Judiciary and Government
Operations Committee report explained that the intention behind
this change was to clarify prospective application:  "Your
Committee has amended this measure by making the application of
the chapter prospective to August 1, 2009, in the interests of
avoiding ambiguity over the time of accrual of any property
right."  HPRA Motion, CSF, Ex. 2, at Senate Journals, SCRep.
770.  This version provided an effective date of July 1, 2050.
Opp. to HPRA Motion, CSF, Ex. 2, at 57.  The Section 1 "purpose"

22

statement continued to reference "establishing" a property right:  "Notwithstanding any existing copyright law concerning sound recordings, the purpose of this Act is to protect the music of Hawaii, and all other works of authorship, by establishing a property right in the commercial use of a person's name, voice, signature, photograph, or likeness."  Id. at 52.

The fourth draft of the bill kept the prospective language, but with an effective date of July 1, 2112.  Id. at 73, 77 (S.D. 2 H.D. 1).  The prospective language was then removed in the fifth draft of the bill.  See S.D. 2 H.D. 2.  The removal is not referenced in the committee reports, and thus is presumably encompassed within the "technical, nonsubstantive changes" referred to.  HPRA Motion, CSF, Ex. 2, at House Journals, SCRep. 1688.  This version kept an effective date of July 1, 2112.  S.D. 2 H.D. 2.

The sixth and final draft of the bill remained without any retrospective or prospective language, but was altered to take effect upon approval.  See Opp. to HPRA Motion, CSF, Ex. 2, at 1-21 (S.D. 2 H.D. 2 C.D. 1).  This final draft—the enacted version—altered the Section 1 "purpose" statement (set forth in the preamble) to read, "The purpose of this Act is to confirm the existence of a property right in the commercial use of a person's name, voice, signature, or likeness known as the right

23

of publicity." Id. at 1 (emphasis added).  But the committee report underlying this final version did not reference the change, and in fact continued to refer to the "purpose of this measure" as "[e]stablishing a property right in the commercial use of a person's name, voice, signature, or likeness."  HPRA Motion, CSF, Ex. 2, at Senate Journals, Conf. Com. Rep. 92.

### 2. The Text of the Statute is Ambiguous

"[T]he starting point in statutory construction is to determine the legislative intent from the language of the statute itself." Wright v. Home Depot U.S.A., Inc., 111 Haw. 401, 409, 142 P.3d 265, 273 (2006) (quoting Morgan v. Planning Dep't, County of Kauai, 104 Hawaii 173, 185, 86 P.3d 982, 994 (2004)).

As stated above, the "purpose" section of the enacted version of the HPRA (set forth in the preamble) explains, "The purpose of this Act is to confirm the existence of a property right in the commercial use of a person's name, voice, signature, or likeness known as the right of publicity." 2009 Hawaii Laws 1st Sp. Sess. Act 28 (S.B. 1005) (cited in . The language codified in Section 482P-2 then explains the scope of the publicity right:

> Every individual or personality has a property right in the use of the individual's or personality's name, voice, signature, and likeness. The right shall continue to exist for a fixed period of time after death, as prescribed in section 482P-

24

> 4. . . . The right does not expire upon the death of the individual or personality, regardless of whether the law of the domicile, residence, or citizenship of the individual or personality at the time of death or otherwise recognizes a similar or identical property right.  This chapter is intended to apply to all individuals and personalities, living and deceased, regardless of place of domicile or place of domicile at time of death.  In the case of a deceased individual or personality, the rights recognized under this chapter shall be deemed to exist at the time of death of any deceased individual or personality or subsequent successor of their rights for the purpose of determining the person or persons entitled to these property rights as provided for in section 482P-3.

HRS § 482P-2.

Collins LLC points to the latter two sentences as requiring application to those who predeceased the statute's enactment.

## A. The "Deemed to Exist" Clause

As to the last sentence, Collins LLC argues that the phrase, "the rights recognized under this chapter shall be deemed to exist at the time of death," would be superfluous if not intended to apply to those who predeceased enactment.  If the statute only applied to those who died after enactment, Collins LLC argues, "there would be no need to state that the rights of deceased persons shall be deemed to exist at the time of death."  Opp. to HPRA Motion at 7.  Collins LLC highlights analogous "deemed to exist" language that was used to amend the publicity rights statutes in Washington, California, and Indiana

in order to make those statutes retrospective.  Wash. Rev. Code § 63.60.010 ("The rights recognized under this chapter shall be deemed to have existed before June 11, 1998, and at the time of death of any deceased individual or personality . . ."); Cal. Civ. Code § 3344.1 ("The rights recognized under this section shall be deemed to have existed at the time of death of any deceased personality who died prior to January 1, 1985"); Ind. Code § 32-36-1-8 ("If the personality died before July 1, 1994, the rights are considered to have existed on and after the date the personality died.").

The WGS Companies counter that the "deemed to exist" language in the cited state statutes each includes a clear anchoring date, specifying that the rights shall be considered to have existed before the relevant effective date of the statute.  The HPRA is conspicuously missing any specific date before which it should be deemed to apply.

Anticipating that argument, Collins LLC explains that the HPRA did not need to include a particular date because unlike the three other state statutes, it was not adding retrospectivity language through amendment.  It is the nature of the amendment, Collins LLC argues, that requires reference to the date on which the original statute was enacted.  Because the Hawaii Legislature included the "deemed to exist" language in

26

its original bill, it was unnecessary to reference any prior enactment date.

Collins LLC's argument is convincing with respect to the persuasive value of other states' reference to the original enactment date.  But it is not the inclusion of a specific date that alone makes those statutes clearly retrospective.  Rather, it is instead the plain language that they apply to those who predeceased enactment.  Earlier drafts of the HPRA likewise clearly stated that "the rights recognized under this chapter shall be deemed to have existed before the effective date." That language would have mirrored the amendments made to indicate retrospectivity in other state statutes, without reference to a date an original statute was enacted, but the Legislature chose to not include it.

The WGS Companies raise another operative role of the "deemed to exist" language.  The HPRA goes on to say that the rights shall be deemed to exist at the time of death <u>for the purpose of determining</u> how the rights are transferred under the subsequent subsection, 482P-3 (dealing with transfer, assignment, and license).  Because the HPRA states that it applies regardless of the individual's domicile, the statute contemplates the situation where a person dies in a state that does not recognize publicity rights.  In that event, succession of the publicity right should operate as though the individual's

domicile recognized such a right.  Said differently, even if the right is not recognized during an artist's lifetime in her place of residence, the right should nevertheless be "deemed to exist at the time of death" for the purpose of determining which heirs inherited the right and who could bring suit under the HPRA. That reading requires no retrospective operation.

The Court finds that the "deemed to exist" language is ambiguous.  Read naturally, the language may be suggestive of retrospective operation and mirrors retrospectivity amendments to analogous statutes in other states.  The language is not explicit however—a fact that is particularly notable in light of earlier explicit language that the Legislature removed. Further, the WGS Companies propose a reasonable interpretation of the language that does not require retrospective operation.

### B. The Statute's Application to "All Individuals and Personalities, Living and Deceased"

Collins LLC also argues that the penultimate sentence makes clear that the HPRA operates retrospectively to individuals who predeceased its enactment.  That sentence provides that the HPRA "is intended to apply to all individuals and personalities, living and deceased."

The WGS Companies cite to Dillinger, LLC v. Electronic Arts Inc., 795 F. Supp. 2d 829 (S.D. Ind. 2011) to support their argument that this language is ambiguous.  In Dillinger, a court

examining Indiana's publicity rights statute (as it existed prior to the retrospectivity amendment discussed above) found that defining a personality as "a living or deceased natural person" was insufficient to convey retrospective intent to those who predeceased enactment, explaining that the statute "can be read equally to protect personalities who live and die after the statute's 1994 enactment, as they can be read to protect those who have ever lived." Id. at 834.  Because the language could be interpreted either way, the court found the provision ambiguous.  In the face of that ambiguity, the court adopted the narrower reading that "Indiana's right-of-publicity statute doesn't apply to personalities who died before its enactment."[8/] Id.

Like the Dillinger court, the Court here finds the language that the HPRA applies to the living and deceased to be ambiguous.  Notably, the language analyzed by the Dillinger court was considerably more limited than provisions Collins LLC here cites.  The HPRA contains additional references that could be read to suggest its application to those who predeceased its enactment; specifically, in addition to defining an individual as a "natural person, living or dead," the HPRA includes the

---

[8/] After that decision, the Indiana Legislature amended the statute to make clear that, "The rights apply to the personality whether the personality died before, on, or after July 1, 1994." Ind. Code § 32-36-1-8 (amended to include the clarifying language in 2012).

above-discussed language that the statute "is intended to apply to all individuals and personalities, living and deceased."

But unlike the amendments made to the publicity rights statutes in other states, the Hawaii Legislature did <u>not</u> include clarifying language that the "deceased" is intended to include those who <u>pre</u>deceased the statute (rather than including only those who die after the statute's enactment).  Indeed, the Washington publicity rights statute—on which the Hawaii statute was based—contains a nearly identical sentence that, "[t]his chapter is intended to apply to all individuals and personalities, living and deceased," but which the Washington Legislature apparently considered insufficient to convey retrospectivity, going on to make completely plain that "[s]uch right exists in . . . individuals or personalities deceased before, on, or after June 11, 1998 [the effective date of the statute]."  Wash. Rev. Code § 63.60.010.

## C. The Effective Date

Finally, some legislatures make retrospectivity express by stating that the relevant act shall take effect upon approval but apply retrospectively to a particular date.  <u>See, e.g.</u>, <u>Croyle v. Theatine Fathers, Inc.</u>, No. CV 19-00421 JAO-WRP, 2019 WL 7340501 (D. Haw. Dec. 30, 2019); <u>Chung Mi Ahn v. Liberty Mut. Fire Ins. Co.</u>, 126 Haw. 1, 9, 265 P.3d 470, 478 (2011).  In fact, as the WGS Companies argue, that is the approach suggested

by the Hawaii Legislative Drafting Manual.  It explains that
"bills are normally drafted so as to take effect upon approval,"
but the Legislature may impose a "[r]etroactive [e]ffective
[d]ate" with the suggested language, "This Act, upon its
approval, shall take effect retroactive to January 1, 20__."
HPRA Motion, CSF, Ex. 4, at 43-44 (Hawaii Legislative Drafting
Manual (2012)) (citing HRS § 1-3).  The Legislature that enacted
the HPRA, however, was apparently not operating under these
parameters.  Even though the HPRA states that it will take
effect upon approval, earlier retrospective and earlier
prospective language was placed in different sections of the
statute—even as the date the statute went into effect varied.
See discussion on the development of the HPRA, supra.
Apparently, the "effective date" was not how this Legislature
chose to address retrospective or prospective intent.

        The Court concludes that the text of the HPRA is
ambiguous.  Accordingly, the Court turns to the legislative
history of the statute.  State v. Reis, 115 Haw. 79, 84, 165
P.3d 980, 985 (2007) ("[A]bsent an absurd or unjust result, we
are bound to give effect to the plain meaning of unambiguous
statutory language; we may only resort to the use of legislative
history when interpreting an ambiguous statute." (internal
citation omitted)).

### 3. The Legislative History is Ambiguous

In addition to the parties' arguments that the language of the HPRA clearly is or is not retrospective, the parties each also argue that the legislative history supports their respective positions.  In particular, the parties disagree on the significance of (1) the Legislature's ultimate removal of both the initial retrospective and later prospective language; and (2) the "purpose" section of the statute.  Neither source makes legislative intent clear.

### A. The Legislature's Removal of the Operative Timeline

The Court turns first to the committee reports.[9/]  As reviewed above, the Legislature included retrospective language

_____

[9/] Collins LLC's arguments on the legislative history largely rely on comments submitted by the community to inform the Legislature's actions.  See Opp. to HPRA Motion at 11-16.  But "the authoritative source for finding the Legislature's intent lies in the Committee Reports on the bill, which represent the considered and collective understanding of those Congressmen involved in drafting and studying proposed legislation."  Wright, 111 Haw. at 411 n.8 (quoting Garcia v. United States, 469 U.S. 70, 76, 105 S. Ct. 479, 83 L. Ed. 2d 274 (1984)); see also Peer News LLC v. City & Cty. of Honolulu, 138 Haw. 53, 71, 376 P.3d 1, 19 (2016) ("To the extent that legislative history may be considered, it is the official committee reports that provide the authoritative expression of legislative intent." (quoting Wright, 111 Haw. at 411 n.8)).  Although the Legislature was presented with the community comments described by Collins LLC, the Legislature did not incorporate that understanding into the text of the statute or its committee reports.  Collins LLC's reliance on community comments is misplaced.

Collins LLC also points to the Governor's Statement of Objections.  According to Collins LLC, the following statement shows retrospective understanding:  "My Administration recognizes there are individuals, particularly within the Hawaiian community, who seek legal protection for the names and images of the many talented artists who are no longer with us."  Opp. to HPRA Motion at 14-15 (quoting Statement of Objections to Senate Bill by Governor Lingle, HPRA Motion, CSF, Ex. 2, at Senate Journals, Gov. Msg. No. 828).  This language suggests an understanding that certain community members supported legislation that would apply retrospectively, but it does not make obvious that the Legislature intended for the enacted statute to so apply.

in the first and second drafts of the bill.  Opp. to HPRA

Motion, CSF, Ex. 2, at 25, 44 ("The rights recognized under this

chapter shall be deemed to have existed before the effective

date of this chapter.").  On the third draft, the Legislature

replaced the retrospective language with prospective language.

The committee report highlights the change, stating, "Your

Committee has amended this measure by making the application of

the chapter prospective to August 1, 2009, in the interests of

avoiding ambiguity over the time of accrual of any property

right."  HPRA Motion, CSF, Ex. 2, at Senate Journals, SCRep.

770.  The prospective language remained in the fourth draft, but

was removed in the fifth draft and never reintroduced.  The

Legislature did not reference the removal of the prospective

language in the committee reports, but did reference a series of

"technical, nonsubstantive changes."

         It is significant that the Legislature's committee

reports make explicit the shift from retrospective to

prospective application of the statute.  Possible prospective

intent might also be inferred from the Hawaii Legislature's

removal of clear retrospective language contained in the

Washington statute on which the Hawaii bill was based. But the

Legislature's ultimate removal of the prospective language

without comment creates ambiguity as to intent.  That ambiguity

is amplified because, as discussed in more detail below, the

Legislature amended the "purpose" section in the last version of
the bill to state that the bill was "confirming the existence"
of a property right rather than "establishing" one, suggesting
an enforceable right existed prior to the HPRA.  The underlying
committee report, however, did not reflect this change and still
referred to "[e]stablishing a property right."  The Court finds
that the evolving operative timelines create, rather than
resolve, ambiguity as to the proper application of the HPRA.

### B. The "Purpose" of the Statute

Because the text of the statute is ambiguous, the
Court may consider the "purpose" of the statute as indicative of
legislative intent.  HRS § 1-15 ("Where the words of a law are
ambiguous . . . [t]he reason and spirit of the law, and the
cause which induced the legislature to enact it, may be
considered to discover its true meaning."); Coon v. City & Cty.
of Honolulu, 98 Haw. 233, 249, 47 P.3d 348, 364 (2002)
(considering "the 'purpose' section of the ordinance" but noting
that "such policy declarations are not substantive law that can
expand the express terms of the operative provisions of the
ordinance"); see also El Comite Para El Bienestar de Earlimart
v. Warmerdam, 539 F.3d 1062, 1070 (9th Cir. 2008) (interpreting
a regulation, but relying on "the analogous context of statutory
construction" to find "the preamble language should not be

considered unless the regulation itself is ambiguous" (internal quotation marks and citation omitted)).

The HPRA contains a "purpose" statement in Section 1, the preamble. The first five drafts of the HPRA stated that the bill's purpose was to "establish[] a property right in the commercial use of a person's name, voice, signature, photograph, or likeness." This language remained unchanged when the Legislature included retrospective language, when the retrospective language was replaced with prospective language, and when the prospective language was removed without comment. But in the final enacted version, the Legislature amended this to provide, "The purpose of this Act is to confirm the existence of a property right in the commercial use of a person's name, voice, signature, or likeness known as the right of publicity." See Opp. to HPRA Motion, CSF, Ex. 2 at 1 (emphasis added).

Collins LLC argues that this change evidences that the HPRA was enacted to "confirm" an existing common law right, established in Fergerstrom v. Hawaiian Ocean View Estates, 50 Haw. 374, 441 P.2d 141, (1968), and "merely codified a method of enforcing" that existing right. Opp. to HPRA Motion at 17 (citing Hyman, 90 Haw. at 5; S.B. 1005, S.D. 2, H.D.2, C.D.1

§ 1).[10/]   According to Collins LLC, this means the statute should

be retrospectively applied.   The WGS Companies point out that

despite this change in the Section 1 "purpose" statement, the

underlying committee report still states that the Act is

"establishing" the existence of the property right and does not

otherwise reference the change.   HPRA Motion, CSF, Ex. 2, at

Senate Journals, Conf. Com. Rep. 92 on S.B. No. 1005.

The Court finds that this change adds to the other

ambiguities in the HPRA as to whether or not the Legislature

intended retrospective or prospective application.   The

Legislature did not explain the change from "establishing" to

"confirming" the right and did not even note the change in its

committee report.

Further, no Hawaii court has found the common law

rights established in <u>Fergerstrom</u> to be nearly as expansive as

the rights provided in the HPRA.   Turning to the common law

right, Hawaii recognized "a cause of action for invasion of the

right of privacy" which was "available for appropriation of name

---

[10/] Amici make the same argument.   <u>See</u> ECF No. 98 at 4 (arguing that the Legislature's use of the word "confirm" rather than the words "establish or create" evidence a recognition that "Hawaii had recognized the common law cause of action for invasion of a right of privacy where the defendant uses the plaintiff's name or picture without permission in advertising for over 50 years" (citing <u>Fergerstrom</u>)).   Collins LLC argues in its motion that changing the language to "confirm" rather than "establish" a right was "perhaps in response" to testimony submitted by community member Mark Bernstein.   Mr. Bernstein attached the <u>Fergerstrom</u> decision to his written testimony and, based on the existing rights in the <u>Fergerstrom</u> decision, argued against prospective application of the HPRA.   Opp. to HPRA Motion at 14 n.8.

or picture for commercial purposes." <u>Fergerstrom</u>, 50 Haw. at 377; <u>see also</u> <u>Sampaio v. Chapman</u>, No. CIV.06-00316 HG BMK, 2006 WL 3097176, at *3 (D. Haw. Oct. 30, 2006) ("In Hawaii, the appropriation of a person's name or likeness for a commercial purpose constitutes invasion of privacy." (citing <u>Fergerstrom</u>)). There is limited law on the <u>Fergerstrom</u> common law right, and as of 2006 "[t]he Hawaii Supreme Court has yet to establish a test determining when an individual's name or likeness has been misappropriated." <u>James v. Am. Pac. Univ.</u>, No. CV 05-00746 JMS/BMK, 2006 WL 8436132, at *8 (D. Haw. Mar. 3, 2006); <u>see also</u> HPRA Motion at 16-18.  Critically here—and as Collins LLC acknowledges—no court has considered whether the common law right is alienable or continues to exist after death, let alone survives for seventy years.[11]  Opp. to HPRA Motion at 18.

Collins LLC speculates that Hawaii courts might have recognized an alienable, post-mortem, and seventy-year-long common law right had the issue been presented.  Opp. to HPRA Motion at 19 (arguing the Hawaii Supreme Court "may well have deemed the right postmortem"); <u>see also</u> <u>id.</u> at 17-20.  In

---

[11] Collins LLC cites to other states that have recognized a common law post-mortem descendible right of publicity.  Opp. to HPRA Motion at 20.  The WGS Companies counter that the treatise Collins LLC cites for this proposition suggests a descendible common law right lasting only twenty years (at most).  Reply supporting HPRA Motion at 15.  The WGS Companies further point out that in each of the cited cases, the plaintiffs brought suit substantially sooner after the death of the subject individual (at most, 21 years) and therefore the cases do not support a post-mortem right lasting as long as Collins LLC here asserts (lasting at least 46 years).  Reply supporting HPRA Motion at 15-16.

support of this argument, Collins LLC cites the ability of the
common law "to expand and adapt to the social, economic, and
political changes inherent in a vibrant human society."  Id. at
19 (quoting Fergerstrom, 50 Haw. at 376).  But Collins LLC cites
no case, and the Court is aware of none, where a statute
substantively added to the court's articulation of common law
and the statute was nevertheless deemed permissibly
retrospective.  Rather, this type of retrospectivity-by-virtue-
of-codification occurs where "prior to the enactment of that
statute, th[e] court had expressly approved" of the specific
right.  Roxas v. Marcos, 89 Haw. 91, 155-56, 969 P.2d 1209,
1273-74 (1998) (finding a statute retrospective where the "clear
spirit" of the statute, "as unambiguously expressed in the
conference committee report . . . was to codify the courts'
preexisting discretion to award prejudgment interest," and
"prior to the enactment of that statute, this court had
expressly approved of the award of prejudgment interest"); see
also Matter of Christian's Estate, 65 Haw. 394, 400 n.11, 652
P.2d 1137, 1141 (1982) ("We need not decide whether this
provision may be applied retroactively to this instant fact
situation, for we find that . . . section 3-101 represents the
common and case law as followed in Hawaii prior to the enactment
of the Uniform Probate Code." (emphasis added)).  Prior to the
enactment of the HPRA, Hawaii courts had not recognized the

38

features of a common law publicity right that Collins LLC now invokes.

The Court concludes that the legislative history, like the text of statute, is ambiguous.  Accordingly, the Court considers whether retrospective application of the HPRA to the WGS Companies would impact their existing rights.

### e. The Hawaii Publicity Rights Act Affects Substantial Existing Rights of the WGS Companies

Because the statutory text and legislative history are ambiguous, the Court considers whether application to Defendants here would involve retrospective operation under the United States Supreme Court's definition.  Specifically,

> we ask whether applying the statute <u>to the person objecting</u> would have a retroactive consequence in the disfavored sense of "affecting substantive rights, liabilities, or duties [on the basis of] conduct arising before [its] enactment," [quoting <u>Landgraf v. USI Film Prod.</u>, 511 U.S. 244, 278, 114 S. Ct. 1483, 1504, 128 L. Ed. 2d 229 (1994)].  If the answer is yes, we then apply the presumption against retroactivity by construing the statute as inapplicable to the event or act in question owing to the "absen[ce of] a clear indication from Congress that it intended such a result."  <u>INS v. St. Cyr</u>, 533 U.S. 289, 316, 121 S. Ct. 2271, 150 L. Ed. 2d 347 (2001).

<u>Fernandez-Vargas v. Gonzales</u>, 548 U.S. 30, 37–38, 126 S. Ct. 2422, 2428, 165 L. Ed. 2d 323 (2006) (emphasis added, some citations omitted).

Here, applying the HPRA to the WGS Companies would impair their prior substantial existing rights.  It is

undisputed that Defendant William Grant & Sons, Inc. entered into a distribution agreement back in 2001—eight years prior to the HPRA's enactment—to assist in creating Sailor Jerry rum. Compl. ¶ 39.  Defendant William Grant & Sons, Inc. then entered to an amendment to that agreement in 2003—five years prior to the HPRA's enactment.  Laches Motion, CSF, Ex. 2.  Defendant William Grant & Sons, Ltd. then purchased the brand outright in 2008—one year prior to the HPRA's enactment.  Compl. ¶¶ 41-42. The WGS Companies conducted each of those transactions in reliance on the law as it existed at the time.

Specifically, the WGS Companies explained at the hearing that they understood their interest in the Sailor Jerry IP was based on trademark, trade name, and copyright laws. There was no practical way for the WGS Companies to consider how those interests might be later limited, or undermined completely, by the then-nonexistent HPRA.  For example, the WGS Companies argue that, in purchasing Sailor Jerry's business, Malone purchased Sailor Jerry's trade name from Mrs. Collins in 1973.  Malone then agreed to share the purchased rights with Ed Hardy.  By 1999, the two had created the entity Sailor Jerry Limited to make and market Sailor Jerry merchandise; by 2001 that merchandise included the product "Sailor Jerry rum" (involving the above-referenced distribution agreement with Defendant William Grant & Sons Inc.).  In 2003, Malone and Hardy

40

assigned their purported interests in the Sailor Jerry IP to the entity Sailor Jerry Limited, and Defendant William Grant & Sons, Ltd. purchased Sailor Jerry Limited in 2008.  The WGS Companies have since continued to market and sell Sailor Jerry rum and other merchandise using the Sailor Jerry IP.  The Court finds that the retrospective operation of the HPRA to strip the WGS Companies of the acquired interest would be a substantial impairment of their rights.

Further, at the time the WGS Companies' purchased the Sailor Jerry brand, their liability was limited to the common law.  Thereunder, the WGS Companies would not be faced with a clear liability period of 70 years from the date of Sailor Jerry's death.  In fact, the WGS Companies may not have been subject to any liability whatsoever since no Hawaii court has yet found the common law invasion of privacy right to be alienable or survive death.[12/]

Applying the HPRA to the WGS Companies would newly subject them to the statutory liability amounts as well.  Under the HPRA, infringers are "liable for the greater of $10,000 or the actual damages sustained as a result of the infringement, and any profits that are attributable to the infringement."  HRS § 482P-6.  Where a statute increases the WGS Companies'

---

[12/] The Court makes no findings on the scope of the common law right, but notes the nebulous contours of that common law right stand in contrast to the clear and relatively extensive protections of the HPRA.

liability, it is a substantive impairment of their existing rights.  <u>Clark</u>, 64 Haw. at 78 (an amendment that increased the statutory liability cap from $20,000 to $40,000 impacted substantive rights and could not be retrospectively applied).

     If the HPRA created a property right in Sailor Jerry's name and image that passed to his heirs in 2009, that would functionally divest the WGS Companies of the substantial existing rights in the Sailor Jerry brand that existed prior to the enactment of the HPRA.  Because "applying the statute <u>to the person objecting</u> would have a retroactive consequence in the disfavored sense," <u>Fernandez-Vargas</u>, 548 U.S. at 37–38 (emphasis added), and giving consideration to "fair notice, reasonable reliance, and settled expectations," <u>Landgraf</u>, 511 U.S. at 270, the Court holds that any rights the WGS Companies legally obtained under existing laws prior to enactment of the HPRA cannot be displaced by the subsequent retrospective operation of the HPRA.

     Based on the foregoing, the Court GRANTS the WGS Companies' HPRA Motion for summary judgment on their Counterclaim Count Two.[13]

---

          [13] The Court reiterates that the WGS Companies have not sought relief with respect to Counts One and Two of the First Amended Complaint (other than with respect to laches); and accordingly, the Court has not made any ruling regarding Counts One and Two of the First Amended Complaint, although some of the Court's findings herein may affect those counts.

## II.  Unjust Enrichment

Collins LLC pleads an unjust enrichment claim in the alternative to its statutory and common law right of publicity claims.  Compl. ¶ 66.

To recover on an unjust enrichment claim, Collins LLC must prove that: (1) it conferred a benefit on the WGS Companies; and (2) the WGS Companies unjustly retained the benefit at Collins LLC's expense.  Durette v. Aloha Plastic Recycling, Inc., 105 Haw. 490, 503-04 & n.9, 100 P.3d 60, 73-74 (2004) (stating that a valid "claim for unjust enrichment requires only that a plaintiff prove that he or she 'confer[red] a benefit upon' the opposing party and that the 'retention [of that benefit] would be unjust,'" and noting the claim seeks to cure "the unjust enrichment of one person at the expense of another" (brackets in original) (quoting Small v. Badenhop, 67 Haw. 626, 635-36 & n.12, 701 P.2d 647, 654 (1985))); Chapman v. Journal Concepts, Inc., 2008 WL 5381353, at *21 (D. Haw. 2008) (quoting Small, and dismissing the unjust enrichment claim based on "Plaintiff's fatal failure to demonstrate" both "that he conveyed a benefit" and "that Defendants have unjustly retained any benefit at his expense").  In reviewing unjust enrichment claims, courts must be guided by the "underlying conception of restitution, the prevention of injustice."  Durette, 105 Haw. at 503.

Collins LLC seeks restitution on its unjust enrichment claim.  Compl. ¶ 69.  Although "state law affords the rule of decision," the Ninth Circuit recently made clear "that a federal court must apply traditional equitable principles before awarding restitution."  <u>Sonner v. Premier Nutrition Corp.</u>, 962 F.3d 1072, 1078, 1080 (9th Cir. 2020).  Here, the relevant equitable principle is the same under federal and state law regardless:  Collins LLC "must establish that [it] lacks an adequate remedy at law before securing equitable restitution." <u>Id.</u> at *3.

### a. Adequate Remedy at Law

The WGS Companies argue that Collins LLC has an adequate remedy at law in the form of its statutory and common law invasion of privacy claims.  Collins LLC responds that the legal remedies available under the HPRA and common law invasion of privacy claims may be insufficient to offer it a complete remedy, and its unjust enrichment claim should therefore be allowed to survive.

Collins LLC has alleged the same conduct to support both its legal and equitable claims.  Accordingly, if the legal claims fail, it follows that Collins LLC would not have shown any wrongful conduct on the part of the WGS Companies and the unjust enrichment claim must fall in tandem.  Any benefit received would not have been without adequate legal basis and

44

would not have been unjustly retained.  Coto Settlement v. Eisenberg, 593 F.3d 1031, 1041 (9th Cir. 2010) (Where the plaintiff brought both a conversion and restitution claim, "[u]njust enrichment is essentially another way of stating a tort claim and, consequently, once the underlying tort claim is dismissed, so is the unjust enrichment claim.").  Equity does not function to resuscitate otherwise lost legal actions.  To hold otherwise would enable any losing plaintiff to convert the lost legal claim into one for unjust enrichment.  See Aquilina v. Certain Underwriters at Lloyd's, No. CV 18-00496-ACK-KJM, 2020 WL 3086549, at *14 (D. Haw. June 10, 2020).

If Collins LLC's statutory or common law claims were to (1) prevail and (2) offer insufficient damages, unjust enrichment may plausibly fill in that gap.  In a case that has been routinely cited for unjust enrichment claims, Hawaii's Intermediate Court of Appeals wrote:

> However, Defendants fail to show that the contract actually addressed a situation like this—where Defendants are alleged to have wrongfully subverted the contractual relationship to deprive Plaintiffs of their books of business. Moreover, the circuit court did not, as Defendants contend, convert a contract case into an equity case, thereby depriving Defendants of a jury trial. Rather, the circuit court conducted a jury trial on the matters triable to a jury and also imposed an equitable remedy upon determining that the contract remedies available did not adequately address Defendants' unjust enrichment (a matter within the circuit court's discretion).

> Plaintiffs also lacked an appropriate tort remedy. Although the jury returned a verdict in their favor and awarded tort damages, Plaintiffs contend the jury's award was insufficient to adequately compensate their losses as a result of Defendants' wrongful conduct. This court agrees with Plaintiffs and concludes that the mere availability of some figure of tort damages does not by itself preclude an award founded on unjust enrichment. As Palmer notes in his treatise on restitution, "[t]he objectives of the two remedies are different, however: in the damage action the plaintiff seeks to recover for the harm done to him, whereas in the restitution action he seeks to recover the gain acquired by the defendant through the wrongful act." 1 George E. Palmer, <u>The Law of Restitution</u> § 2.1, at 51 (1978). Although the tort and unjust enrichment claims are, in a sense, founded on the same wrongful conduct—the deprivation of Plaintiffs' books of business by Defendants—the remedies sought are sufficiently distinct, in this court's view, to exclude this case from the realm of "double recovery" situations.

<u>Porter v. Hu</u>, 116 Haw. 42, 55–56, 169 P.3d 994, 1007–08 (Ct. App. 2007).[14/]

In contrast, cases dismissing unjust enrichment claims based on an adequate remedy at law involve differing claims for the same remedy. See <u>Sonner</u>, 962 F.3d at 1081 ("Sonner fails to explain <u>how the same amount of money</u> for the exact same harm is inadequate" (emphasis added)); <u>Aquilina</u>, 2020 WL 3086549 at *14 (dismissing an unjust enrichment claim where the plaintiffs

---

[14/] The Court notes that the ICA did indicate that, "While no Hawaiʻi case explicitly endorses this principle, this court views it as a logical extension of the principle set forth above in <u>Regency Tower Venture</u>, and therefore we endorse its application in situations like this one." <u>Porter</u>, 116 Haw. at 55.

"alleged the same conduct" and "the exact same damages" to "support their legal and equitable claims"); <u>Soule v. Hilton Worldwide, Inc.</u>, 1 F. Supp. 3d 1084, 1103 (D. Haw. 2014) (dismissing an unjust enrichment claim where the plaintiff "fail[ed] to indicate how the damages she would receive" under her legal claims were "inadequate," and the claim was barred by an express contract regardless); <u>Davis v. Four Seasons Hotel Ltd.</u>, No. CIV. 08-00525 HG-BMK, 2011 WL 5025521, at *6 (D. Haw. Oct. 20, 2011) (dismissing an unjust enrichment claim because the plaintiffs' statutory claim "preclude[d] the assertion of an unjust enrichment claim seeking the same damages").

The Court notes that the major relief Collins LLC seeks for its unjust enrichment claim is disgorgement.  Compl. ¶ 69.  Collins LLC seeks that same remedy for its first cause of action, "Violation of Hawaii's Law Against Misappropriation of Plaintiff's Right to Publicity."  Compl. ¶ 53.  Collins LLC's first cause of action is, however, largely reliant on the HPRA, which the Court has already found may not be retrospectively applied to the WGS Companies in this case.  Given that the Court granted the WGS Companies summary judgment on the non-retrospectivity of the HPRA as applied to them, Collins LLC's first cause of action may ultimately fail to offer an adequate legal remedy.

Collins LLC's remaining causes of action seek differing remedies from the unjust enrichment claim.  Compare Compl. ¶ 69 (on the unjust enrichment claim, seeking "restitution in the form of a constructive trust, disgorgement of Defendants' illgotten profits, money payment, and/or any other relief that this Court deems appropriate") with ¶ 61 (on the cancellation of publicity rights claim, asking that Defendant William Grants & Sons, Limited's "Certificate of Registration of Publicity Rights Name number 270004" be "be cancelled and deleted from the public DCCA registry") and ¶¶ 63, 64 (on the invasion of privacy claim, seeking "injunctive relief, damages, and any other relief that this Court deems appropriate," as well as "declaratory relief that Sailor Jerry's common law right of publicity survived his death").

Accordingly, the Court finds that Collins LLC may lack an adequate remedy at law.  However, Collins LLC's unjust enrichment claim nevertheless fails because it does not show a benefit was conferred at Collins LLC's expense.

### b. Conferral of a Benefit

"Typically, a claim for unjust enrichment arises out of an allegation that the plaintiff has bestowed a benefit in money, property, or services upon the defendant, and the plaintiff then seeks some form of relief in equity to prevent the unjust enrichment of the defendant."  Lumford v. Yoshio Ota,

48

144 Haw. 20, 25, 434 P.3d 1215, 1220 (Ct. App. 2018).  Here, Collins LLC argues that the benefit conferred "is the value of, and the economic benefits flowing from, the exclusive right to exploit the Persona of Sailor Jerry (as defined in HRS 482P)." Opp. to Enrichment Motion at 4.  According to Collins LLC, "Defendants have exploited the stolen publicity rights," which "Defendants and their predecessors-in-interest never legally acquired."  Id.  The WGS Companies respond that this very logic is "antithetical to an unjust enrichment claim" since, if the rights were stolen, they were necessarily never "conferred." Enrichment Motion at 13.

As stated above, unjust enrichment requires a showing that a benefit was conferred on the WGS Companies <u>at the expense</u> of Collins LLC.  Collins LLC fails to articulate any loss it suffered in connection with the WGS Companies' use of the Sailor Jerry IP, and Collins LLC lacked any expectation of monetary benefit from the WGS Companies' use thereof.

As to the WGS Companies' use of the Sailor Jerry IP, Collins LLC's claim fails because the benefit bestowed on the WGS Companies must correspond with a loss suffered by Collins LLC.  <u>Chapman v. Journal Concepts, Inc.</u>, No. CIV. 07-00002 JSM/LE, 2008 WL 5381353, at *21 (D. Haw. Dec. 24, 2008); <u>see also</u> <u>Cabbat v. Philip Morris USA, Inc.</u>, No. CIV. 10-00162 DKW, 2014 WL 32172, at *12 (D. Haw. Jan. 6, 2014) (resolving whether

the defendant "has received a benefit unjustly turns on a determination of whether there was some injury to the [individual plaintiffs] that would not have otherwise occurred").  Collins LLC here points to the WGS Companies' economic gains from the purportedly stolen Sailor Jerry IP but does not show that those gains corresponded to any loss on its part.  See, e.g., Compl. ¶ 50 (stating generically that "Defendants have been unjustly enriched and Plaintiff has suffered injury," but failing to identify how Collins LLC was injured by the WGS Companies' gains).  Cf. Porter v. Hu, 116 Haw. 42, 53, 169 P.3d 994, 1005 (Ct. App. 2007) (finding unjust enrichment where "Plaintiffs each developed a book of business . . . that they justifiably anticipated would generate substantial renewal commissions" but because of "Defendants' improper conduct, Plaintiffs lost, and AIA received, a portion of Plaintiffs' books of business that generated for AIA $714,000.00 in gross commissions").

Preceding this lawsuit, Collins LLC's conduct and finances (and that of its members) would have been virtually identical had the WGS Companies and their predecessors never created Sailor Jerry rum or sold any merchandise.  Collins LLC had not interacted with the WGS Companies prior to this

lawsuit,[15/] had no expectation to benefit from the WGS Companies'
use of the Sailor Jerry IP, and in fact asserts that the WGS
Companies were using the Sailor Jerry IP for approximately eight
years before Collins LLC even knew that the WGS Companies'
products existed.

 "Where Plaintiff has not suffered a loss, his claim of
unjust enrichment cannot prevail." Chapman v. Journal Concepts,
Inc., No. CIV. 07-00002 JSM/LE, 2008 WL 5381353, at *21 (D. Haw.
Dec. 24, 2008).  In Chapman, the plaintiff brought a defamation
claim and an unjust enrichment claim.  Although the court found
certain sufficient allegations of defamation, it dismissed the
claim for unjust enrichment because "Plaintiff has not shown
that Defendants have unjustly retained any benefit at his
expense." Id. (internal citation omitted); see also Miracle v.
New Yorker Magazine, 190 F. Supp. 2d 1192, 1203 (D. Haw. 2001)
(dismissing an unjust enrichment claim brought alongside a
defamation claim in part because the plaintiff "has not alleged
or demonstrated that she conferred any benefit to The New
Yorker that requires restitution"); Evans v. Crowe & Mulvey,
LLP, No. CV 20-00082 JMS-KJM, 2020 WL 2748484, at *5 (D. Haw.

---

[15/] Mrs. Collins does refer to making an announcement of her displeasure
at a 2009 tattoo convention where there was a sizable Sailor Jerry rum
display, but she did not know if any employees or representatives of the WGS
Companies heard her announcement.  Collins Dep. at 70.  Leading up to this
lawsuit, the WGS Companies also intervened in the 2018 probate proceeding
mentioned above.

May 27, 2020) (plaintiff's allegation that defendants posted a video of him on YouTube without his permission and gained royalties therefrom did not state a claim for unjust enrichment, in part because "it is not at all clear whether Plaintiff bestowed a benefit to one or more Defendants").[16/]

Collins LLC attempts to characterize its loss as the WGS Companies' failure to compensate it for the Sailor Jerry IP, despite the WGS Companies' extensive profits therefrom.  Opp. to Enrichment Motion at 7 (pointing to allegations "that Defendants have retained all of the benefits and profits from the Sailor Jerry brand, that they have never provided Plaintiff any compensation for doing so, and that the Defendants' retention of these significant financial benefits has been at the expense and to the detriment of Plaintiff").  But Collins LLC has not alleged that it had any expectation to benefit from the sale of Sailor Jerry rum and other merchandise, nor has it adequately alleged how the WGS Companies' benefit was obtained at its expense.

Collins LLC incorrectly relies on Lumford for this argument.  Lumford involved the transfer of a house.  The

---

[16/] The WGS Companies additionally cite persuasive authority from other circuits finding that "unauthorized use of publicity (and similar rights) cannot, as a matter of law, support an unjust enrichment claim."  Reply at 3; see also Enrichment Motion at 12-14 (both citing, inter alia, Pellegrino v. Epic Games, Inc., 2020 WL 1531867, Civil Action No. 19-1806 (E.D. Pa. March 31, 2020)).

plaintiff's aunt owned a house and purportedly transferred it to the defendant on the understanding that the defendant would transfer the house to the plaintiff once she reached the requisite maturity.  Id. at 22.  The defendant instead sold the house, and then argued the plaintiff had no claim for unjust enrichment since the aunt—and not the plaintiff—was the one who conferred the benefit of the house on the defendant.  Id.  The Hawaii Appellate Court rejected this argument, finding that even though the third-party aunt had conveyed the benefit on the defendant, the plaintiff could still maintain a cause of action for unjust enrichment if she could show a clearly superior entitlement to the house.[17/]  Id. at 27-28.

But in Lumford, the plaintiff had an expectation in the benefit of the house, and absent the defendant's misconduct, the plaintiff would have had the house.  The defendant's benefit was thus squarely at the expense of the plaintiff.  In contrast, Collins LLC here has not alleged any expectation to benefit from the sale of Sailor Jerry rum and other merchandise.  Absent

---

[17/] In carving this exception for the third-party conferral of a benefit, the Lumford court was clear that the exception is narrow.  It applies "in limited circumstances," where "a third party has conferred a benefit upon a defendant to which the plaintiff claims he or she has a superior legal or equitable right."  Lumford, 144 Haw. at 27.  The court emphasized that it would "not suffice to make out a claim in restitution" if the plaintiff "merely" proved "that the defendant has received a windfall, that the claimant has been ill-treated, and that the third party's payment to the defendant (or the defendant's retention of payment as against the claimant) violates rules of good faith, basic fairness, or common decency." Id. (internal quotation marks and citation omitted).

Defendants' alleged misconduct, those monetary benefits would not exist at all, and certainly would not otherwise flow to Collins LLC.  Thus, although Collins LLC has alleged that Defendants were enriched by the sales, it has still failed to allege that enrichment was at its expense.

As Hawaii courts have recognized, unjust enrichment does not address "all injustice but rather one special variety: the unjust enrichment of one person at the expense of another." Small v. Badenhop, 67 Haw. 626, 636 n.12, 701 P.2d 647, 654 (1985) (quoting 1 G. Palmer, The Law of Restitution § 1.1 (1978)).[18]  Collins LLC has not adequately alleged any loss from the WGS Companies' use of the Sailor Jerry IP and lacks any separate interest in the WGS Companies' profits therefrom.

Accordingly, the Court GRANTS the WGS Companies' Motion for Judgment on the Pleadings, and DISMISSES without prejudice Collins LLC's claim for unjust enrichment.

---

[18]  The Small court found that the defendant had been unjustly enriched where the plaintiffs had conveyed real property to the defendants in reliance on a confidential relationship and oral promises of payment that were never fulfilled.  Specifically, the parties had agreed to work together and attempt improvements on the relevant parcels of land.  "To further this attempt," the plaintiffs, upon request of the defendant, "transferred title to a parcel of land, which [the plaintiffs] had purchased for $1,500, to [the defendant] for a nominal consideration and also made it possible for him to acquire another parcel, which they had originally agreed to buy, for less than its actual value."  67 Haw. at 635.  Because of the confidential relationship between the parties, the court held that "[i]t would be unjust if the Badenhops were permitted to retain the entire benefit of the transactions."  Id. at 637.  In Small, unlike here, the benefit to the defendants clearly corresponded to the loss suffered by plaintiffs.

### III.   The Doctrine of Laches

The WGS Companies assert that the doctrine of laches bars all of Collins LLC's claims.  Because laches relies on the Court's equitable powers, the Court applies federal equitable principles.  <u>Sonner</u>, 962 F.3d at 1078 ("It has been a fundamental principle for well over a century that state law cannot expand or limit a federal court's equitable authority.").

"Laches is an equitable time limitation on a party's right to bring suit, resting on the maxim that one who seeks the help of a court of equity must not sleep on his rights." <u>Jarrow Formulas, Inc. v. Nutrition Now, Inc.</u>, 304 F.3d 829, 835 (9th Cir. 2002) (internal quotations marks and citation omitted). While statutes of limitation bar untimely legal causes of action, "[l]aches serves as the counterpart to the statute of limitations, barring untimely equitable causes of action."[19] <u>Id.</u>  The distinction between the two has been emphasized by the Supreme Court, which held that "in face of a statute of limitations enacted by Congress, laches cannot be invoked to bar

---

[19] As the WGS Companies explain in their briefs, this distinction is no longer relevant under Hawaii law, where, today "laches is a defense in all civil actions" even though the doctrine arose as a defense only in equitable actions.  <u>Ass'n of Apartment Owners of Royal Aloha v. Certified Mgmt., Inc.</u>, 139 Haw. 229, 235, 386 P.3d 866, 872 (2016).  Collins LLC originally filed this action in state court, where the WGS Companies could have invoked Hawaii's rules.  Having removed the action to federal court, the WGS Companies cannot now complain that they are faced with federal principles of equity.

legal relief." Petrella v. Metro-Goldwyn-Mayer, Inc., 572 U.S. 663, 679, 134 S. Ct. 1962, 1974, 188 L. Ed. 2d 979 (2014).

The WGS Companies' motion for summary judgment on the basis of laches seeks dismissal of all four of Collins LLC's causes of action. Because the Court has already found that the HPRA does not apply retrospectively to the WGS Companies, the Court only addresses the laches argument as to the common law right to privacy and the unjust enrichment causes of action.[20]

### a. Laches is an Equitable Defense

Laches may be applied to Collins LLC's claims for common law invasion of privacy and unjust enrichment only to the extent that those claims seek equitable relief.

The Supreme Court has considered the doctrine of laches in relation to different bodies of intellectual property legislation. In the context of damages actions under copyright and patent law, the Supreme Court has held that laches does not apply because in the Copyright and Patent Acts, Congress enacted

---

[20] Although Collins LLC's unjust enrichment claim was above dismissed without prejudice, the Court finds it prudent to address this additional argument for dismissal since laches could bar the claim even if properly pled. The Court does not, however, address the application of laches to Collins LLC's first and second causes of action. Although the Court does not herein dismiss those causes of action, it is unclear what, if any, bases remain for those causes of action in light of the Court's holding on retrospectivity. The Court need not speculate because the Court ultimately grants Collins LLC's Rule 56(d) request for additional time to conduct discovery, and accordingly denies the Laches Motion at this time. If the WGS Companies again move for summary judgment on the basis of laches after Collins LLC has had time to complete discovery, the parties should address what claims or relief remain viable under the first and second causes of action in light of the Court's holdings herein, and the Court will address the arguments at that time.

specific statutes of limitation.  "Laches is a gap-filling doctrine, and where there is a statute of limitations, there is no gap to fill." <u>SCA Hygiene Prod. Aktiebolag v. First Quality Baby Prod., LLC</u>, 137 S. Ct. 954, 961, 197 L. Ed. 2d 292 (2017) (laches does not apply to claims for damages under the Patent Act because the Patent Act has an explicit six-year limitation period) (citing <u>Petrella</u>, 572 U.S. at 667 (laches "cannot be invoked to preclude adjudication of a claim for damages brought within [the Copyright Act's express] three-year window")).  In contrast, laches has been routinely invoked in trademark cases because the governing Lanham Act "contains no statute of limitations, and expressly provides for defensive use of 'equitable principles, including laches.'" <u>Petrella</u>, 572 U.S. 663, 678 n.15 (noting the dissent "fail[ed] to observe that Lanham Act contains no statute of limitations").  Collins LLC's unjust enrichment claim and its invasion of privacy claim are both common law causes of action without specific legislatively-imposed statutes of limitation, and laches may therefore bar untimely assertion of those claims.[21/]  <u>Cf.</u> <u>Petrella</u>, 572 U.S. 663.

The application of laches is limited, however, to Collins LLC's claims for equitable relief.  <u>Petrella</u>, 572 U.S.

---

[21/] As discussed <u>infra</u>, each claim relies on generic limitations periods broadly encompassing "damages to person" or else the "catch-all" limitations periods.

at 678 ("this Court has cautioned against invoking laches to bar legal relief" because "laches is a defense developed by courts of equity; its principal application was, and remains, to claims of an equitable cast for which the Legislature has provided no fixed time limitation"); City of Sherrill, N.Y. v. Oneida Indian Nation of New York, 544 U.S. 197, 217, 125 S. Ct. 1478, 1491, 161 L. Ed. 2d 386 (2005) (laches "may bar long-dormant claims for equitable relief"); Jarrow Formulas, 304 F.3d at 835 ("Laches serves as the counterpart to the statute of limitations, barring untimely equitable causes of action.").

Because "[u]njust enrichment is an equitable rather than a legal claim," McKesson HBOC, Inc. v. New York State Common Ret. Fund, Inc., 339 F.3d 1087, 1091 (9th Cir. 2003), laches may apply.  Collins LLC's common law invasion of privacy claim, however, appears to seek both equitable relief (in the form of an injunction) and legal relief (damages).[22/] Accordingly, laches may apply to the invasion of privacy claim only to the extent that it seeks equitable relief.[23/]  Petrella,

---

[22/] While damages are typically considered a legal remedy, certain types of damages claims are properly viewed as equitable.  City of Monterey v. Del Monte Dunes at Monterey, Ltd., 526 U.S. 687, 710-11, 119 S. Ct. 1624, 1639, 143 L. Ed. 2d 882 (1999) (noting the "general rule that monetary relief is legal" but referencing certain "monetary remedies available in equity" such as "equitable restitution").

[23/] To the extent that the common law invasion of privacy claim seeks legal relief, it would not be susceptible to a laches defense; although in that event it may be barred by the statute of limitations.  However, the Court will not at this time address the statute of limitations issue as the WGS Companies have not sought dismissal of Collins LLC's common law right of publicity in Count Three of the First Amended Complaint except on laches.

572 U.S. at 667-68 (finding that "laches may bar at the very threshold the particular [equitable] relief" in certain circumstances, as distinguished from the claim for damages, to which laches could not apply); Danjaq LLC v. Sony Corp., 263 F.3d 942, 960 (9th Cir. 2001) (finding "laches may bar prospective injunctive relief" "when, as here, the feared future infringements are identical to the alleged past infringements").

### b. Elements of a Laches Claim

"Although laches is distinct from a statute of limitation, we make laches determinations 'with reference to the limitations period for the analogous action at law.'" Eat Right Foods Ltd. v. Whole Foods Mkt., Inc., 880 F.3d 1109, 1115 (9th Cir. 2018) (quoting Jarrow Formulas, 304 F.3d at 835–36). "If the plaintiff filed within that period, there is a strong presumption against laches.  If the plaintiff filed outside that period, the presumption is reversed."  Id. (quoting Tillamook Country Smoker, Inc. v. Tillamook Cty. Creamery Ass'n, 465 F.3d 1102, 1108 (9th Cir. 2006)).

To prove laches, a defendant must show two elements: that the plaintiff unreasonably delayed in bringing its claims, and that the defendant was prejudiced by that delay.  Evergreen Safety Council v. RSA Network Inc., 697 F.3d 1221, 1226 (9th Cir. 2012).

### c. A Presumption of Laches Applies

The Court finds that the unjust enrichment claim would be subject to a six-year limitations period, while the invasion of privacy claim would be subject to a two-year limitations period.  Either of limitation periods would begin to run when Collins LLC had knowledge of the allegedly infringing use and would have therefore expired.  Accordingly, a presumption of laches applies.

### 1. Two- and Six-Year Statutes of Limitations Apply

In Hawaii, a "claim for unjust enrichment is subject to a six-year limitations period under HRS § 657-1." Honolulu Acad. of Arts v. Greene, No. 15-00355 DKW-KSC, 2016 WL 4522667, at *6 (D. Haw. Aug. 29, 2016).

As to the common law invasion of privacy claim, the Hawaii Supreme Court has referenced, albeit in dicta, that "the tort limitations period for 'damages to person' in HRS § 657-7 seemingly appl[ies]" in "actions for invasion of privacy" even though "the interests protected are intangible in nature." Higa v. Mirikitani, 55 Haw. 167, 170, 517 P.2d 1, 4 (1973).  The court made this assertion despite a party raising the "catch-all" provision HRS § 657-1, leaving no doubt that the court found the "damages to person" statute, and not the catch-all, governed invasion of privacy actions. Id. at 169 (stating the plaintiff had argued for the limitations period "for personal

60

actions 'not specifically covered' elsewhere" (citing HRS § 657-1)).

Citing Higa, a court in this district later relied on the two-year limitations period in HRS § 657-7 for an invasion of privacy claim.  Haldeman v. Golden, No. 05-00810 DAE-KSC, 2007 WL 521842, at *2 (D. Haw. Feb. 13, 2007).  Another court in this district applied the two-year limitations period governing defamation claims to a false light invasion of privacy claim. Shipley v. Hawaii, No. CIV 05-00145 JMS/BMK, 2006 WL 2474059, at *3 (D. Haw. Aug. 24, 2006).  Accordingly, the Court finds a two-year limitations period would apply to the invasion of privacy claim.

## 2. When the Limitation Periods Began to Run

The parties fundamentally disagree on how the statutes of limitation operate with regard to the WGS Companies' ongoing use of the Sailor Jerry's IP.  The WGS Companies argue that the limitations period began to run when Mrs. Collins became aware of the allegedly infringing conduct; at a minimum, this occurred when Mrs. Collins saw a bottle of Sailor Jerry rum in 2009. Laches Motion at 16-20.  In contrast, Collins LLC argues that every bottle of rum (or other product) sold featuring Sailor Jerry represents a discrete violation and triggers its own limitations period.  Collins LLC thus argues that all sales

61

within the six years preceding the filing of its lawsuit are within the limitations period.  Opp. to Laches Motion 9-14.

Because Hawaii courts have not specifically addressed this issue, both Collins LLC and the WGS Companies cite to copyright law as the most analogous statutory scheme.[24]  The Court agrees that copyright law is instructive and concludes that, because this lawsuit boils down to an ownership dispute, the statute of limitations began to run at the latest when Mrs. Collins discovered the bottle of Sailor Jerry rum in 2009.

Arguing to the contrary, Collins LLC invokes the separate-accrual rule relied on in the United States Supreme Court decision Petrella v. Metro-Goldwyn-Mayer, Inc., 572 U.S. 663, 134 S. Ct. 1962, 188 L. Ed. 2d 979 (2014).  Under the separate-accrual rule, a defendant commits a new violation of the Copyright Act each time an infringing work is reproduced or distributed.  Id. at 671.  A plaintiff may only recover for the discrete violations that occurred within the three-year limitations period immediately preceding the lawsuit, but

---

[24] "A federal court sitting in diversity applies the substantive law of the state, including the state's statute of limitations."  Albano v. Shea Homes Ltd. P'ship, 634 F.3d 524, 530 (9th Cir. 2011); see also Guar. Tr. Co. of N.Y. v. York, 326 U.S. 99, 110, 65 S. Ct. 1464, 1470, 89 L. Ed. 2079 (1945) ("if a plea of the statute of limitations would bar recovery in a State court, a federal court ought not to afford recovery").  "State law also determines when the statute of limitations begins to run on state claims." Norco Const., Inc. v. King Cty., 801 F.2d 1143, 1145 (9th Cir. 1986) (stated in contrast to the often-cited § 1983 context, where state limitations periods and federal accrual rules apply).

importantly, laches cannot bar an action for violations that occurred within that three-year window.  Id. at 671, 677-79.

The WGS Companies argue that the separate-accrual rule does not apply here, where the gravamen of the First Amended Complaint is a dispute over the ownership of publicity rights, not an infringement action.  The Ninth Circuit explained and adopted the distinction in the copyright case Seven Arts Filmed Entertainment Ltd. v. Content Media Corp. PLC, 733 F.3d 1251 (9th Cir. 2013):  "For ordinary claims of copyright infringement" where "ownership is not in dispute," "each new infringing act causes a new claim to accrue."  Id. at 1254.  But where the defendant "concedes it is exploiting the pictures, but denies that [the plaintiff] owns the copyrights," then the limitations period will "accrue only once, when plain and express repudiation of co-ownership is communicated to the claimant."  Id. (internal quotation marks and citation omitted). Where both ownership and infringement claims are brought, the ownership claim must be timely in order to bring the infringement claim.  Id. at 1255.

Because the parties' dispute is, at bottom, an ownership dispute, the Court holds that the accrual rule in

Seven Arts governs.  Thus, the limitations periods began to run here when Collins LLC discovered the allegedly wrongful conduct.

The Ninth Circuit has analogized the ownership rules articulated in Seven Arts as a type of adverse possession in the context of copyright:  "Copyright, like real estate, lasts a long time, so stability of title has great economic importance." Zuill v. Shanahan, 80 F.3d 1366, 1370 (9th Cir. 1996).  And although Petrella spoke favorably of "allow[ing] a copyright owner to defer suit until she can estimate whether litigation is worth the candle" in the context of infringement, 572 U.S. at 683, the Ninth Circuit has explicitly considered and rejected that same logic in the context of ownership disputes, noting "the burden and deterrent to development and marketing by a co-owner."  Zuill, 80 F.3d at 1370.  These considerations weigh strongly in the present case where Plaintiff seeks to upset the stability of title that the Sailor Jerry rum brand has asserted for approximately twenty years, and that the WGS Companies themselves have asserted with Mrs. Collins' knowledge for ten years.  Reply supporting Laches Motion at 5 (noting the ten-year delay since "Plaintiff 'discovered' Defendants' adverse ownership" and arguing that "[w]hat Plaintiff characterizes as 'continuing infringement' is continuous, open exercise of ownership").

64

This approach also aligns with the approach taken to ongoing violations in the context of the Lanham Act for which, like the claims at issue here, Congress did not enact a statutory limitations period.  Jarrow Formulas, 304 F.3d at 837 (finding that even though "[f]or many Lanham Act claims, the alleged violations are ongoing," "the presumption of laches is triggered if any part of the claimed wrongful conduct occurred beyond the limitations period").

This dispute is clearly one of ownership rights.  The WGS Companies concede—and could not earnestly contest—that they are using the Sailor Jerry IP for their brand, but the WGS Companies assert that they own that IP.  Collins LLC, on the other hand, alleges that it is the sole owner of the Sailor Jerry IP and seeks a declaratory judgment that the WGS Companies have no right or interest in Sailor Jerry's publicity rights, an injunction permanently barring the WGS Companies from using Sailor Jerry's name or image, and disgorgement of all the WGS Companies' profits obtained therefrom.  Compl. at 19-20. Applying the accrual rules for ownership disputes, any limitations period was triggered at latest when Collins LLC discovered the WGS Companies' use of Collins LLC's purportedly exclusive IP interest in 2009.[25]

---

[25] Both parties have focused on Mrs. Collins' knowledge of the WGS (Continued . . .)

Collins LLC argued at the hearing that Seven Arts does
not apply because, unlike that case, the parties here did not
have a prior close relationship.  According to Collins LLC, the
Seven Arts logic makes sense only where there is a close
relationship because in that context, repudiation clearly puts
the opposing party on notice of an ownership dispute.  Since
Mrs. Collins had no prior relationship with the WGS Companies,
Collins LLC argues that Mrs. Collins' discovery of Sailor Jerry
rum in 2009 did not put her on notice that the WGS Companies
were actually claiming to own the Sailor Jerry IP.

The same issue was raised in Seven Arts itself.  The
plaintiff there argued that the express repudiation rule did not
apply because the parties were not in a "close relationship,"
but instead involved use by a "putative downstream, third party
licensee."  733 F.3d at 1256.  The Ninth Circuit acknowledged
that applying the express repudiation "accrual rule to encompass
claims against those who are not in a close relationship could

---

Companies' use of the Sailor Jerry IP.  The WGS Companies argue in their
motion that Mrs. Collins' laches are imputed to Collins LLC.  Laches Motion
at 22.  Collins LLC has not contested the issue.  The Court therefore
understands the parties to agree Mrs. Collins' discovery of the WGS
Companies' use of the Sailor Jerry IP binds Collins LLC.  See Gillons v.
Shell Co. of California, 86 F.2d 600, 605 (9th Cir. 1936) ("Generally
speaking, plaintiff is barred from relief by the laches of one with whom he
stands in privity, as . . . an assignee by that of his assignor." (internal
quotation marks omitted)); Brown v. Bishop Tr. Co., 44 Haw. 385, 402, 355
P.2d 179, 187–88 (1960) ("Knowledge of the conduct giving rise to the
complainant's cause of action may be imputed to the complainant by reason of
an opportunity to acquire knowledge or because of circumstances of which he
was cognizant, such as obvious and unconcealed activities affecting the
property in dispute." (internal quotation marks and citation omitted)).

introduce uncertainty," but concluded that it "need not decide which rule applies to suits against unknown third parties" because in that case, the parties' "predecessors-in-interest were in the sort of 'close relationship' envisioned" by the case law.  Id.

Here too, the parties' predecessors-in-interest had a type of "close relationship."  The original oral contract on which the ownership dispute is here based was between Mrs. Collins, Sailor Jerry's wife, and Malone, Sailor Jerry's mentee. Mrs. Collins chose to sell to Malone because she wanted "to give those who Jerry admired the opportunity to buy his business."[26] In fact, the nature of the parties' relationship is one of the several ways on which Mrs. Collins was put on notice of the present dispute:  Hellenbrand (Malone's girlfriend at the time of the oral contract, who put down the initial deposit for the purchase) contacted Mrs. Collins to inform her that Sailor Jerry's image was on a rum bottle.

Regardless, the Ninth Circuit's reservations in distinguishing parties with a type of "close relationship" from

---

[26] Mrs. Collins wrote in a letter seeking to contact Malone that she "would like to give those who Jerry admired the opportunity to buy his business," and noted that she "plan[ned] to sell everything to one person rather than split it up and sell piece-meal."  Laches Motion, CSF ¶ 5 (citing Ex. 8); see also Opp. to Laches Motion, CSF, ECF No. 113 (admitting same). Mrs. Collins further testified that she sold to Malone, not because he offered the best price, but because "the main thing was I think it was better that someone that [Sailor Jerry] had mentored had the shop."  Collins. Dep. at 100.

"unknown third parties" are based on issues of notice.  Here, Mrs. Collins was plainly on notice of the WGS Companies' widespread use of Sailor Jerry's name and image on the rum bottle.  Mrs. Collins saw an image of the bottle in a restaurant; located the bottle at a local drugstore; attended a tattoo convention where the WGS Companies had "the biggest display there" for Sailor Jerry rum, Collins. Dep. at 69; had a telephone conversation with Hellenbrand and Hellenbrand's attorney regarding the WGS Companies' use of Sailor Jerry's image on the rum bottle; and stated that she believed the WGS Companies' use constituted identity theft.

Finally, although Seven Arts itself declined to reach the issue of "unknown third parties," subsequent courts apply the ownership versus infringement claim distinction without reference to any "close relationship" requirement.  See, e.g., Consumer Health Info. Corp. v. Amylin Pharm., Inc., 819 F.3d 992, 997 (7th Cir. 2016) (citing Seven Arts and concluding, without reference to any close relationship requirement, that it was "persuaded by the unanimous line of cases from our sister circuits" and holding that "when the gravamen of a copyright suit is a question of copyright ownership, the claim accrues when the ownership dispute becomes explicit—that is, when the claimant has notice that his claim of ownership is repudiated or contested"); Latin Am. Music Co., Inc. v. Spanish Broad. Sys.,

<u>Inc.</u>, 232 F. Supp. 3d 384, 389 (S.D.N.Y. 2017), <u>aff'd,</u> 738 F. App'x 722 (2d Cir. 2018) (holding, without reference to any close relationship requirement, that "[a]n ownership claim accrues only once, when a reasonably diligent plaintiff would have been put on inquiry [notice] as to the existence of a right" (internal quotation marks and citation omitted; brackets in original)).

Here, Collins LLC's claims are, at bottom, about its ownership of publicity rights and the requisite considerations in the analogous copyright ownership context have already been weighed by the Ninth Circuit.  In fact, Collins LLC itself relies first and foremost on analysis of copyright law.

As explained in <u>Seven Arts</u>,

It is inequitable to allow the putative co-owner to lie in the weeds for years after his claim has been repudiated, while large amounts of money are spent developing a market for the copyrighted material, and then pounce on the prize after it has been brought in by another's effort.

733 F.3d at 1255 (quoting <u>Zuill</u>, 80 F.3d at 1370-71).

Accordingly, the Court here finds that the limitations period began to run in 2009.  Because either the two- or six-year limitations period expired prior to Collins LLC's filing of this lawsuit in 2019, a presumption of laches applies.

**d. Collins LLC Unreasonably Delayed in Bringing Claims**

The first component of a laches defense is Collins LLC's unreasonable delay in bringing its claims. "When evaluating the reasonableness of a delay, the evaluation period begins when the plaintiff knew (or should have known) of the allegedly infringing conduct, and ends with the initiation of the lawsuit in which the defendant seeks to invoke the laches defense." Evergreen Safety, 697 F.3d at 1226. To determine reasonableness, courts will look to what caused the delay. "Delay has been held permissible for a variety of reasons, such as when delay is required by an exhaustion of remedies through an administrative process, when it is used to evaluate and prepare a complicated claim, or when its purpose is to determine whether the scope of proposed infringement will justify the cost of litigation." Id. at 1227 (internal quotation marks and citation omitted). "By contrast, delay is impermissible when its purpose is to capitalize on the value of the alleged infringer's labor, by determining whether the infringing conduct will be profitable." Danjaq LLC v. Sony Corp., 263 F.3d 942, 954 (9th Cir. 2001).

Collins LLC concedes that Mrs. Collins learned of Sailor Jerry rum in 2009. Opp. to Laches Motion at 21. This lawsuit was filed in June 2019. ECF No. 1-2. As already discussed, any relevant statute of limitations has expired, and

Collins LLC has not overcome the presumption that laches applies.

Collins LLC's sole argument on this point is that, when Mrs. Collins discovered Sailor Jerry rum in 2009, she was under the "mistaken belief that she did not have a claim," and it was not until 2018 "that she found lawyers who could apprise her of her rights." Opp. to Laches Motion at 21-22. But Mrs. Collins acknowledges that she believed the WGS Companies' use of the Sailor Jerry IP constituted identity theft and contacted several attorneys upon her discovery, although she did not ultimately retain counsel. Mrs. Collins also participated in a three-way call with Hellenbrand and Hellenbrand's attorney regarding the use of Sailor Jerry's artwork on the bottle of rum. Regardless, laches begins to run when a party is aware of the allegedly infringing conduct, not when a party is aware it had a legal cause of action.

In Evergreen Safety, the court found the laches period began to run when the plaintiff received a letter containing reference to the alleged infringement even though the party claimed not to have opened that letter until nearly twelve years later. 697 F.3d at 1227. The court concluded the plaintiff's ten-year delay between receipt of the unopened letter and filing its lawsuit constituted unreasonable delay. See also Crews v. Prudential Ins. Co. of Am., No. CIV. 14-00009 ACK, 2015 WL

71

1646935, at *6 (D. Haw. Apr. 13, 2015) (finding the plaintiff had unduly delayed when there was "no dispute of material fact that Plaintiff knew or should have known . . . about the existence of his FSGLI claim, but failed to inquire about it for ten years.").

Further, Hawaii law makes clear that, under the discovery rule, limitations periods begin to run when a plaintiff has knowledge of all facts supporting her claim; "[i]t does not delay the start of the limitations period until the plaintiff learns of the legal duty upon which he or she may base a cause of action." Hays v. City & Cty. of Honolulu, 81 Haw. 391, 398, 917 P.2d 718, 725 (1996). To hold otherwise "would allow plaintiffs to indefinitely delay the start of the limitations period until they seek the advice of an attorney." Id. Like in the limitations context, Collins LLC's delay cannot be justified by ignorance of the law, when Collins LLC had knowledge of the relevant facts supporting its claim.

Because the Court concludes hereinafter that pursuant to Collins LLC's Rule 56(d) request it is entitled to additional time to conduct limited discovery on its unclean hands defense, the Court now defers making any ruling whether or not the WGS Companies have shown unreasonable delay.

The Court next considers prejudice to the WGS Companies.

**e. The WGS Companies Were Prejudiced by Collins LLC's Delay**

The second component of a laches defense is prejudice. The Ninth Circuit categorizes two types of prejudice that can give rise to laches:  expectations-based prejudice and evidentiary prejudice.  Eat Right Foods, 880 F.3d at 1119. "Expectations-based prejudice exists where a defendant took actions or suffered consequences that it would not have, had the plaintiff brought suit promptly," while "[e]videntiary prejudice exists where a plaintiff's delay has led to lost, stale, or degraded evidence, or witnesses whose memories have faded, or who have died."  Id. at 1119-20.  With either type of prejudice, the Ninth Circuit emphatically requires that the prejudice occurred during the plaintiff's delay, not prior.[27/]  Id. at 1120.

The WGS Companies here submit significant evidence of prejudice, particularly in the form of their considerable investment in the Sailor Jerry Rum brand since 2009.  The WGS Companies also cite a limited ability to adequately defend their position due to an evidentiary prejudice from the passage of time.

---

[27/] Hawaii case law indicates the same requirement.  Poka v. Holi, 44 Haw. 464, 357 P.2d 100, 107 (1960) ("Equitable relief will be refused when, during inexcusable delay, the evidence has become obscured and, under the circumstances of the case, it is too late to ascertain the merits of the controversy." (emphasis added)).

### 1. Expectations-Based Prejudice

The WGS Companies' investment in Sailor Jerry rum has increased the value of the subject rights, caused a change the WGS Companies' position, and involved intervening rights of third parties.

The WGS Companies submit evidence that they invested approximately £169.4 million between 2009 and 2018 into advertising the Sailor Jerry brand. Laches Motion, Rochford Decl. ¶¶ 5-9. As a result, the Sailor Jerry rum brand has increased dramatically in value. Id. at ¶ 11. Further, the WGS Companies' position has been altered by virtue of the now-expired contractual indemnities they obtained in purchasing the rights to the Sailor Jerry IP from Sailor Jerry Limited; certain of which expired in 2010 and certain of which expired in 2018. Laches Motion, CSF, Ex. 3 (WG&S Purchase Agreement §§ 2.1(c); 3.8(b); 3.8(f); 13.1(a); 13.3(a); 13.3(c); Schedule 1). And, during Collins LLC's delay, third party collaborators and distributors have contracted with the WGS Companies for certain rights relating to the Sailor Jerry rum brand, including sponsorships, merchandise, and distribution rights. Laches Motion, CSF, Yusen Decl. ¶¶ 15-17. The WGS Companies would be unable to perform under those contracts if Collins LLC prevails. Id. at ¶ 17.

Collins LLC responds that the WGS Companies had been
marketing Sailor Jerry rum for ten years prior to Mrs. Collins'
discovery of the product, and the WGS Companies continued
production thereafter was therefore not detrimental.  Collins
LLC also contends that because the WGS Companies made a profit
during the ten-year delay, it cannot have been financially
prejudiced.  Finally, Collins LLC argues that the WGS Companies
should have known that their ownership rights in the Sailor
Jerry IP were "questionable," and thus any prejudice is not
attributable to Collins LLC but rather the WGS Companies' own
fault.

None of these arguments are viable.  That the WGS
Companies had already invested in the Sailor Jerry brand prior
to the period of delay does nothing to negate the substantial
investment they undertook during the period of delay.  Nor does
the fact the WGS Companies profited from their investment
(profits that Collins LLC now seeks for itself) undermine that
the WGS Companies are now facing prejudice for having done so.
Absent Collins LLC's delay, the WGS Companies may have invested
those same funds to grow a different brand.  But operating under
the assumption they were permissibly using the purchased Sailor
Jerry IP, the WGS Companies invested in the Sailor Jerry brand—
investments that would now prove detrimental if Collins LLC's
lawsuit is successful.  Finally, Collins LLC's averment that the

WGS Companies should have questioned the asserted ownership interest is unconvincing, where Sailor Jerry rum had been widely marketed effectively without question for nearly twenty years prior to this lawsuit.  The only apparent issue of ownership during that time was Hellenbrand's claim of a partial ownership interest, but Hellenbrand's letters to the WGS Companies state that "Ms. Hellenbrand along with Michael Malone, became owners of the Sailor Jerry tattoo business and all related intellectual property in 1973," thereby underscoring the validity of the WGS Companies' purchase from Malone.  Collins LLC also submits an email sent to the WGS Companies' predecessor in 2004 relating to the Sailor Jerry IP, but that email chastises the use of the Sailor Jerry IP on "shoddy merchandise" rather than undermining the ownership interest itself.[28/]  Opp. to Laches Motion, CSF, Ex. 6.

## 2. Evidentiary Prejudice

The WGS Companies' evidentiary prejudice is more limited.  The WGS Companies emphasize Malone's death, but Malone died in 2007.  His death did not occur during the period of

---

[28/] The email does conclude by stating that Hellenbrand has letters from Sailor Jerry in which he apparently spoke negatively about Hardy. Hellenbrand states, "These letters may well have an impact on how the world perceives the 'rights' you and your company may allegedly hold." Pl's. Opp. to Laches Motion, CSF, Ex. 6.  But that email begins by stating, "I purchased [Sailor Jerry's] estate with Michael Malone when Jerry died." Id.  The 2004 email, in this regard, aligns with the content of the 2009 letter to the WGS Companies, asserting that both Malone and Hellenbrand had an interest in the Sailor Jerry IP.

delay, which began in 2009. Eat Right Foods, 880 F.3d at 1120 (evidentiary prejudice considers events during the plaintiff's delay).

The WGS Companies next argue that Mrs. Collins has a faulty memory given her misunderstanding of the 1973 probate. Mrs. Collins filed a petition for determination of heirs in 2018 in which she asserted that Sailor Jerry's estate was never probated, despite the fact the estate had indeed been probated in 1973. Mrs. Collins indicated that she did not understand the full legal impact of the 1973 probate. Laches Motion at 11, 13. The Court is not convinced, however, that Mrs. Collins had any better understanding of the 1973 probate in 2009, as opposed to in 2018. That is to say, while the Court acknowledges that some depreciation in all relevant witness' memories has undoubtedly occurred since 1973, the WGS Companies have not shown any particular additional depreciation during the ten-year delay at issue. This causes only limited prejudice.

The WGS Companies also reference the deaths of two "[k]ey managers of Defendants' acquisition of Sailor Jerry Rum and related IP." Laches Motion at 12. But the WGS Companies do not make clear what unique information those managers would have. This is especially true if, as the WGS Companies repeatedly argue, the emphasis is on the 1973 oral contract

rather than the WGS Companies' decades-later purported purchase of Sailor Jerry IP.  The extent of this prejudice is limited.

In sum, the WGS Companies suffered considerable expectations-based prejudice and some limited evidentiary prejudice from Collins LLC's laches.  Collins LLC argues, even so, that the WGS Companies cannot invoke laches because they have unclean hands.

### f. Unclean Hands

Collins LLC argues that the Court is precluded from granting summary judgment at this time because material factual issues remain as to whether the WGS Companies have unclean hands.  Opp. to Laches Motion at 23-24.  "The unclean hands doctrine closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief."  Jarrow Formulas, 304 F.3d at 841 (internal citation and quotation marks omitted).  "[O]nly a showing of wrongfulness, willfulness, bad faith, or gross negligence, proved by clear and convincing evidence, will establish sufficient culpability for invocation of the doctrine of unclean hands."  Pinkette Clothing, Inc. v. Cosmetic Warriors Ltd., 894 F.3d 1015, 1029 (9th Cir. 2018) (quoting Pfizer, Inc. v. Int'l Rectifier Corp., 685 F.2d 357, 359 (9th Cir. 1982)); see also Straub v. Cty. of Maui, No. CV 17-00516 JMS-WRP, 2019 WL 5088738, at *13 (D. Haw. Oct. 10, 2019) ("Under federal law,

to prevail on a defense of unclean hands a defendant must demonstrate by clear and convincing evidence: (1) that the plaintiff's conduct is inequitable; and (2) that the conduct relates to the subject matter of [the plaintiff's] claims." (internal quotation marks and citations omitted)).

The WGS Companies point to Adair as having rejected, in Hawaii, the doctrine of unclean hands as applicable to a laches defense. Reply supporting Laches Motion at 12-13. But the Court applies federal equitable principles under which unclean hands applies to a laches defense. Sonner, 962 F.3d at 1078; Jarrow Formulas, 304 F.3d at 841.

The WGS Companies next argue that Collins LLC has presented no evidence of unclean hands. The Court agrees that, on the facts before it, Collins LLC has not shown unclean hands. Collins LLC cites to Hellenbrand contacting the WGS Companies' predecessors in 2004 and the WGS Companies in 2009, but Hellenbrand only asserted her own claimed interest in the Sailor Jerry IP (rather than that of Mrs. Collins or Collins LLC's other members). And Hellenbrand informed the WGS Companies that "Ms. Collins indicated that she assigned the rights to Mr. Malone and Ms. Hellenbrand." Laches Motion, CSF, Ex. 5. Because the WGS Companies assert that they are successors-in-interest to Malone, Hellenbrand's letters support their interest as legitimate (if not exclusive). Collins LLC argues that the

79

WGS Companies did not conduct sufficient diligence because they did not contact Mrs. Collins; while the WGS Companies counter with their reliance on ten years of open use, coupled with Malone's affidavit of ownership, and Mrs. Collins' admission that she never contacted the WGS Companies.[29]

But Collins LLC's inability to bring forward evidence of unclean hands may well be due to the stay of discovery the WGS Companies sought and obtained immediately after filing its dispositive motions.  Because of that stay, Collins LLC has been prevented from conducting virtually any discovery.  As discussed next, the Court finds that Collins LLC is entitled to an opportunity to conduct the discovery necessary to make its case.

### g. Collins LLC's Rule 56(d) Request

Collins LLC moves for a Rule 56(d) delay in any ruling and for permission to conduct discovery.

Under Rule 56(d), a district court may postpone ruling on a summary judgment motion to allow for further discovery where the non-moving party needs "additional discovery to explore facts essential to justify the party's opposition."

---

[29] Collins LLC states in passing that Malone's 2003 affidavit is inadmissible.  Opp. to Laches Motion at 17 ("Malone had no documentation of the 1973 sale until he created a self-serving (and inadmissible) affidavit"). Collins LLC does not state the basis for its inadmissibility claim.  Because the Court ultimately grants Collins LLC's Rule 56(d) request for additional time to complete discovery and accordingly denies the Laches Motion at this juncture, the Court need not resolve the issue here.  If the issue comes before the Court again and Collins LLC wants the Court to disregard the affidavit as inadmissible evidence, it should explain the basis for that objection and permit the WGS Companies an opportunity to respond.

Jones v. Blanas, 393 F.3d 918, 930 (9th Cir. 2004).  "A party
seeking additional discovery under Rule 56(d) must explain what
further discovery would reveal that is essential to justify its
opposition to the motion for summary judgment."  Stevens v.
Corelogic, Inc., 899 F.3d 666, 678 (9th Cir. 2018) (internal
quotation marks and citation omitted).  "In particular, the
requesting party must show that: (1) it has set forth in
affidavit form the specific facts it hopes to elicit from
further discovery; (2) the facts sought exist; and (3) the
sought-after facts are essential to oppose summary judgment."
Id. (emphasis in original).

        "The burden is on the party seeking additional
discovery to proffer sufficient facts to show that the evidence
sought exists, and that it would prevent summary judgment."
Emp'rs Teamsters Local Nos. 175 & 505 Pension Trust Fund v.
Clorox Co., 353 F.3d 1125, 1129-30 (9th Cir. 2004) (citation
omitted).  A district court may "deny further discovery if the
movant has failed diligently to pursue discovery in the past, or
if the movant fails to show how the information sought would
preclude summary judgment."  Id. at 1130 (citation omitted).

        Collins LLC argues that it needs additional discovery
to oppose the motion for summary judgment on laches in three
crucial areas.  First, it argues that it needs information as to
the due diligence conducted by the WGS Companies prior to

building the Sailor Jerry brand in order to support its arguments that the WGS Companies suffered no prejudice and have unclean hands.  Opp. to Laches Motion at 24.  Second, Collins LLC argues that it needs full financial information for the alleged period of delay in bringing this suit—2009 until 2019—to dispute the WGS Companies' assertion of prejudice, as well as information pertaining to the third-party contracts that the WGS Companies asserts were impacted due to Collins LLC's delay.  Id. at 25.  Third, Collins LLC argues that it needs information pertaining to any investigation the WGS Companies undertook in relation to Hellenbrand's claim that Malone lacked ownership of the Sailor Jerry IP, and the contractual protections between the WGS Companies and their predecessors.  Id. at 25.  Collins LLC adequately specifies particular facts it hopes to obtain in discovery, and because it points to routine business documents and communications, Collins LLC has made a sufficient showing that such facts likely exist.

The Court reaches this holding cognizant of the strictly limited discovery that has thus far occurred in this case.  The WGS Companies filed their dispositive motions three months after removing the case to federal court, and simultaneously sought a stay of all discovery until those motions were decided.  ECF Nos. 1, 19, 20, 25, 28.  The

magistrate judge granted that stay, and discovery has largely come to a halt since.  ECF No. 39, 57; see also ECF No. 74.

Thereafter, Collins LLC sought (and was ultimately granted) leave to file an amended complaint.  ECF No. 81.  The First Amended Complaint added some additional facts, removed a prior unfair competition claim, and added a new common law invasion of privacy claim.  See ECF No. 82.  The Court therefore administratively withdrew the WGS Companies' pending motions and instructed the WGS Companies to file new motions covering the amended claims.  ECF No. 84.  All parties apparently understood the magistrate judge's discovery stay to remain in effect despite the Court's administrative withdrawal of the prior motions on which the stay was based.

The Court cannot criticize Collins LLC's diligence with regard to discovery.  Collins LLC not only opposed the motion to stay, it further sought ex parte reconsideration; upon denial, it separately sought a hearing on its motion for reconsideration; and, upon denial, apparently attempted to at least pursue third-party discovery initiated prior to the stay. ECF Nos. 42, 43, 52, 65, 70.  All of these efforts were stymied.

In his order granting the stay, the magistrate judge suggested that "Defendants' Dispositive Motions have the potential to either eliminate or reduce the scope of discovery," and he explicitly did not restrict Collins LLC's ability to seek

Rule 56(d) relief.  ECF No. 57.  The magistrate judge's predictions have been borne out:  the Court here grants Rule 56(d) relief, but does so on substantially narrowed claims.

The Court GRANTS Collins LLC's Rule 56(d) request to the extent that Collins LLC has not had an opportunity to conduct discovery on the issue of whether unclean hands bars the application of laches.  The request was only made in opposition to the Laches Motion, and it is therefore only granted in that regard.  The Court will allow Collins LLC four months from the issuance of this Order to conduct the specified discovery.[30/]

The Court DENIES the Rule 56(d) request to the extent that it seeks discovery regarding the WGS Companies' third-party contracts and the WGS Companies' full financial information.

Because the Court has granted in part the Rule 56(d) request, it accordingly DENIES the Laches Motion at this time.

## <u>CONCLUSION</u>

The Court:

(1) Based on its aforesaid findings, concludes that the HPRA does not operate retrospectively against the WGS Companies and accordingly the Court GRANTS the WGS Companies' Motion for Partial

---

[30/] Accordingly, the current dispositive motions deadline of October 7, 2020, is extended to January 29, 2021.

Summary Judgment as to its Counterclaim Count Two (Non-Retrospectivity of the Hawaii Publicity Rights Act), ECF No. 92;

(2)   GRANTS the WGS Companies' Motion for Judgment on the Pleadings as to Count Four of the First Amended Complaint, unjust enrichment, ECF No. 91 and DISMISSES Count Four of the First Amended Complaint without prejudice; and

(3)   DENIES the WGS Companies' Motion for Summary Judgment on Laches as to all four counts of the First Amended Complaint, ECF No. 89, on the basis that it GRANTS IN PART Collins LLC's Rule 56(d) request for additional time to conduct discovery on its "unclean hands" defense, and affords Collins LLC an additional four months to conduct discovery thereon.

Because Collins LLC may be able to cure the pleading defects in Count Four of the First Amended Complaint via amendment, leave to amend is granted.  Any second amended complaint must be filed within thirty days of the issuance of this Order and should comply with the guidance and standards set forth herein.  The Court cautions Collins LLC that if it fails to file its second amended complaint within thirty days of the

issuance of this Order, or, if a claim in the second amended complaint fails to cure the defects identified in this Order, the Court will dismiss Collins LLC's unjust enrichment claim with prejudice.  The Court emphasizes that it has not granted Collins LLC leave to make other changes, such as adding new parties or entirely new claims.  Leave to amend is limited to curing the defects described in this Order.  If Collins LLC wishes to make further amendments not within the scope of leave provided in this Order, it must file a motion for leave to amend pursuant to Rule 15(a)(2) and Local Rule 10.4.


IT IS SO ORDERED.

DATED:  Honolulu, Hawai`i, July 17, 2020.

_____
Alan C. Kay
Sr. United States District Judge

N.K. Collins, LLC v. William Grant & Sons, Inc. et al., Civ. No. 19-00386 ACK-RT, Order Granting Defendant's Motion for Partial Summary Judgment and Judgment on the Pleadings, and Denying Defendants' Motion for Summary Judgment.